Shirley P. SAHLIE, et al., Plaintiffs,

v.

Benny F. NOLEN, et al., Defendants.

Civil Action No. 97–T–258–N.

United States District Court,
M.D. Alabama,
Northern Division.

Oct. 31, 1997.

William D. Coleman, Joseph Lister Hubbard, Clement Clay Torbert, III, Capell, Howard, Knabe & Cobbs, P.A., Montgomery, AL, for Plaintiffs.

Robert E. Gilpin, Kaufman & Rothfeder, P.C., Montgomery, AL, William H. Boice, Amy L. Weisbecker, Kilpatrick & Stockton, LLP, Atlanta, GA, for Defendants.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Plaintiffs Shirley P. Sahlie and M. Clark Sahlie brought this lawsuit alleging various claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001 through 1461, commonly known as ERISA, against the defendants Benny F. Nolen, M.D. Nolen, Jr., and G.J. Harris (collectively, the trustee defendants), individually and in their capacities as trustees of the Bama Wood, Inc. Profit Sharing Plan & Trust.[1] Also named as a defendant is Bama Wood, Inc., the administrator of the Plan. Shirley P. Sahlie is the surviving spouse and designated beneficiary of Bill Sahlie, a former trustee and participant in the Plan; and M. Clark Sahlie, their son, is the executor of Bill Sahlie's estate. Pursuant to 29 U.S.C.A. § 1132(a)(1)(B), in Count I of the complaint Mrs. Sahlie seeks to recover benefits allegedly due her under the Plan, enforce her rights under the Plan, and clarify her rights to any future benefits under the Plan. In Counts II and III of the complaint, both plaintiffs, individually and on behalf of the Plan, seek relief pursuant to 29 U.S.C.A. §§ 1109, 1132(a)(2) and 1132(a)(3) for the trustee defendants' alleged breach of fiduciary duties and violations of ERISA and Plan provisions. In Count IV of the complaint, both plaintiffs demand relief pursuant to 29 U.S.C.A. §§ 1132(a)(1)(A) and (c) for the alleged failure of Bama Wood, as administrator of the Plan, to supply them with requested information as required under ERISA. This court's jurisdiction has been properly invoked pursuant to 29 U.S.C.A. § 1132(e)(1).

Pending before the court is the motion for partial summary judgment filed by all of the defendants as to Counts I and IV of the complaint. For the following reasons, the motion will be granted in part and denied in part.

## I. BACKGROUND

The following summary is limited to those background facts that are pertinent to the pending motion.

The Plan at issue in this case is a retirement plan maintained by Bama Wood for the benefit of its employees, and administered by an employer-appointed committee comprising only the trustee defendants, who also serve as the Plan's sole trustees. The trustee defendants are also the only shareholders of Bama Wood. Since its establishment in 1968, the Plan's investments have been limited almost exclusively to timber-producing real property.

Bill Sahlie was the founder and former president of Bama Wood. Until his retirement in 1990, when his shares were acquired by the trustee defendants, Mr. Sahlie was the majority stockholder of Bama Wood. He also participated in the Plan, and was one of its original trustees, serving in that capacity until he was removed in April 1996 by the trustee defendants.

Under the Plan's provisions, Bill Sahlie became eligible for a distribution of his account balance following the July 31, 1995, annual valuation of the Plan's assets. At that time, Mr. Sahlie's was the largest account in the Plan; collectively, those held by the individual trustee defendants had the next largest balance.

At some time prior to April 1996, Bill Sahlie learned that the trustee defendants intended to pursue a "cash-out" of his account in the Plan, and planned to obtain a loan to secure the necessary funds. Mr. Sahlie responded, via his attorney, by requesting that his distribution under the Plan be made in the form of an "in-kind" distribution, meaning that he sought his payment in real property, rather than cash. The next several months saw a flurry of correspondence between Mr. Sahlie's attorney and counsel for the trustee defendants, in which the latter insisted that Mr. Sahlie was not entitled to an in-kind distribution under the Plan's provisions. In the course of this cor-

---

1. As explained below, the three trustee defendants also serve as the administrators of the Plan. For the sake of simplicity, the court will refer to them as the trustee defendants throughout this order, irrespective of whether the action at issue concerns their duties as trustees or as administrators of the Plan.

respondence, Mr. Sahlie's attorney reemphasized his position that the Plan permitted Mr. Sahlie to elect an in-kind distribution. Additionally, he expressed serious concerns about the July 31, 1995, valuation of Plan assets, which would have formed the basis of any distribution of Mr. Sahlie's account balance. Mr. Sahlie feared that the trustee defendants had substantially under-valued the Plan's properties, to his and the other participants' detriment. These concerns prompted Mr. Sahlie to retain an independent appraisal firm for purposes of obtaining a second opinion regarding the fair-market value of the Plan's real property assets. Mr. Sahlie's attorney, by letter dated April 24, 1996, informed counsel for the trustee defendants that he was initiating this appraisal, and noted his expectation that Mr. Sahlie "will be entitled to reimbursement of his reasonable expenses, including his attorneys' and appraisal fees, if his efforts result in any material change in the actions taken by the Plan Administrator or the other trustees, such as a change in the value of Plan assets." Although Mr. Sahlie's attorney requested that the trustee defendants confirm if they did not object to the reimbursement of Mr. Sahlie's expenses, no response was forthcoming.

Sometime in May 1995, after the appraisal firm retained by Bill Sahlie had completed its evaluation, Mr. Sahlie, along with his counsel, a representative of the appraisal firm, the trustee defendants, their counsel, and other Plan participants, attended a meeting in which the information obtained by the appraisal firm was presented and discussed. Soon thereafter, as the date for the July 1996 evaluation neared, the trustee defendants solicited bids for the purchase of three of the Plan's real properties. Through his attorney, Mr. Sahlie, when he first learned of the impending call for bids, wrote the trustee defendants to set forth in detail his concerns regarding the mechanics and validity of the bid process. Mr. Sahlie subsequently submitted the highest bid received for the three parcels, but the trustee defendants rejected it and all of the other bids they received.

On June 14, 1996, in response to a letter from the trustee defendants, who were acting as the Plan administrator, Bill Sahlie submitted a claim for the distribution of his account balance. Because the election form provided to him by the trustee defendants did not permit a choice of in-kind distribution, Mr. Sahlie returned a form of his own design in which he had selected the newly-created option denoted "lump sum distribution in property fairly representative of all of the assets in the Plan."

After this claim was submitted, the letter-writing campaign between the two sides continued unabated. In the meantime, the trustee defendants had obtained the July 31, 1996, valuation of the Plan's real properties, performed by Rigsby Investment Company, Inc., a firm which had previously performed a similar evaluation in support of the trustee defendants' loan application aimed at securing sufficient funds to "cash-out" Mr. Sahlie's account balance. The trustee defendants had declined to engage Mr. Sahlie's appraisal firm for this purpose.

Bill Sahlie died on August 15, 1996, but his wife and son continued to pursue the distribution that he had originally requested. After having their appraisal firm review the July 31, 1996, valuation, Clark and Shirley Sahlie communicated to the trustee defendants what their attorney characterized in a letter dated the following day as "a compromise settlement proposal." This letter described the "settlement proposal" as calling for a lump sum cash distribution calculated on the basis of the trustee defendants' July 31, 1996, valuation, and including both an interest payment reflecting post-valuation, pre-distribution earnings, and a sum to reimburse the Sahlies for their legal and other expenses incurred while prosecuting their claim. Additionally, Mrs. Sahlie reserved her right to seek an "in-kind" distribution of her husband's account in the event that the proposal was not accepted.

In their follow-up correspondence, the trustee defendants informed the Sahlies that they would treat the letter as setting forth Mrs. Sahlie's "initial claim for benefits under the Plan because of the prior agreement to postpone election as to form of benefit until [her] analysis of Plan financial data was completed." The trustee defendants then denied the claim in its entirety. Regarding the lump sum cash proposal, the trustee defendants noted that they understood it to reflect

the fact that Mrs. Sahlie deemed the July 31, 1996, valuation to be incorrect, and they provided the following reasons for the denial:

"Section 5.2 of the Plan provides that, with respect to non-securities assets, the Plan Trustees may value such assets itself, or in its discretion, employ an appraiser to establish value.... It is noted that you have previously received and reviewed the Trustee's valuation. Participant has not asserted any error in the valuation procedure used by Trustees, nor presented any appraisal or other information supporting Participant's asserted valuation...."

Regarding an in-kind distribution, the trustee defendants remarked that the Plan provision providing for such distributions "has been consistently administered not to permit in-kind distributions of real property assets held by the Plan.... The principal consideration behind the policy was that, because of the nature of the asset, the Administrator could not fashion any method of allocating parcels of property which would be equitable and not discriminatory."

On December 20, 1996, pursuant to the Plan's provisions, the trustee defendants held an appeal hearing on Mrs. Sahlie's claim. At the outset of the hearing, the trustee defendants provided the Sahlies for the first time with a copy of their newly-drafted "Procedure for Property Distributions". This document sets forth guidelines for the distribution of in-kind real property assets under the Plan. According to the trustee defendants, adoption of the Property Distribution Procedure reflected a revision of their "consistently administered" policy not to permit in-kind distribution. The trustee defendants remarked that the guidelines were developed and adopted by them "in accordance with the powers granted by the Plan to construe the Plan document and establish reasonable rules and procedures."

Not satisfied with the distribution she was to receive under the Property Distribution Procedure, Mrs. Sahlie proposed an alternative set of guidelines to the trustee defendants. The parties dispute the degree to which the trustee defendants considered this alternative proposal, but the record establishes that they did not adopt it, nor did they ever revise the Property Distribution Procedure to incorporate any of Mrs. Sahlie's proposed guidelines.

The Sahlies' dissatisfaction with the trustee defendants' proposed distribution plan led them to file their complaint in this action on February 28, 1997. In Count I, the first of the two counts at issue in the defendants' motion for partial summary judgment, the plaintiffs seek pursuant to 29 U.S.C.A. § 1132(a)(1)(B) to have the Property Distribution Procedure adopted by the trustee defendants rescinded or amended, so that Mrs. Sahlie may obtain an in-kind distribution of Mr. Sahlie's account in the form they desire. Alternatively, the plaintiffs seek a cash distribution of the account based upon the fair-market value of the Plan's assets, as determined by a qualified, independent appraiser. In the second count at issue here, Count IV, the plaintiffs seek relief under 29 U.S.C.A. § 1024(b)(4) for the alleged failure of the trustee defendants, acting as Plan administrators, to provide them with requested materials regarding the Plan. As explained below, the motion for partial summary judgment will be denied as to two of the trustee defendants' actions challenged in Count I, but granted as to two other challenged actions. Additionally, the defendants' motion will be granted as to the plaintiffs' entire claim in Count IV of the complaint.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265; *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the non-movant vary depending on whether the legal issues, as to which the facts in question

pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### III. DISCUSSION

### COUNT I: PLAINTIFFS' CLAIM FOR RECOVERY OF BENEFITS, ETC., UNDER ERISA § 1132(a)(1)(B)

#### i. Proper Defendant

■ Before considering the substance of the plaintiffs' claim under ERISA § 1132(a)(1)(B) for recovery of benefits, the court will address the defendants' contention that the plaintiffs may recover benefits under this section of ERISA exclusively from the Plan itself, and not from the other named defendants, Bama Wood and the individual trustee defendants. On this basis, the defendants assert, Count I should be dismissed as to Bama Wood and the individual trustee defendants.

The court agrees with the defendants. Courts consistently have held that in a § 1132(a)(1)(B) claim for recovery of benefits, only the plan itself and the administrators and trustees of the plan in their capacities as such are subject to liability. *See Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1199 (2d Cir.1989); *Gelardi v. Pertec Computer Corp.,* 761 F.2d 1323, 1324–25 (9th Cir.1985). Thus, Bama Wood, as the employer who has set up the Plan, may not be held liable for any benefits owed the plaintiffs under the Plan. *See Miller v. Pension Plan Employees of Coastal Corp.,* 780 F.Supp. 768, 773 (D.Kan.1991). Nor are the trustee defendants, as individuals, subject to liability under § 1132(a)(1)(B). *See* 29 U.S.C.A. § 1132(d)(2) ("Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.") The court notes that the plaintiffs have proffered no arguments to counter the defendants' assertions on this issue.

Accordingly, Count I of the plaintiffs' complaint will be dismissed as to Bama Wood and the trustee defendants in their individual capacities.

#### ii. Standard of Review

As is true in virtually all challenges brought under ERISA for the recovery of benefits, the court here must first tackle the issue of what standard of review to apply to the administrators' plan interpretations and benefit determinations. Helpful guidance on how to resolve this issue is provided by the United States Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115–16, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), which mandates *de novo* judicial review of a decision to deny ERISA benefits, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If the plan does in fact vest the administrator with such discretion, the far more deferential arbitrary and capricious standard is used to review the contested actions. *Id.* at 111–12, 109 S.Ct. at 954–55. Thus, to determine the applicable standard of review, here the court must first examine the language of the Plan's provisions and decide whether the trustee defendants were given the discretionary authority to undertake the actions challenged by the plaintiffs in Count I of their complaint.

This analysis is facilitated by assessing the discretionary nature of each of the trustee defendants' challenged actions separately. In count I of the complaint, the plaintiffs attack four more-or-less distinct aspects of the trustee defendants' response to the Sahlies' claim for benefits: (1) their adoption of the Property Distribution Procedure for in-kind distributions; (2) their valuation of the Plan's real property assets, which is used to determine the value of individual distributions, including Bill Sahlie's; (3) their refusal to reimburse the Sahlies for their attorney's fees and other expenses incurred as a result of the prosecution of their claim for distribution of Mr. Sahlie's account balance; and (4) their denial of the Sahlies' request for interest and earnings on Mr. Sahlie's account

balance from the July 31, 1996, valuation date until the actual date of distribution.

### (a) Adoption of Procedure for In–Kind Distribution

■ The first of the challenged activities is the trustee defendants' adoption of the Property Distribution Procedure governing in-kind distributions of real property assets from the Plan. The plaintiffs assert that under *Firestone* this action should be reviewed *de novo* by the court, because the Plan documents do not grant the trustee defendants discretion to adopt such guidelines or procedures. The main thrust of the plaintiffs' argument misses the mark, however, because they mistakenly focus on the original denial of Mr. Sahlie's claim for an in-kind distribution, rather than the eventual promulgation of the Property Distribution Procedure. If the posture of the case were such that Mrs. Sahlie's claim under 29 U.S.C.A. § 1132(a)(1)(B) was based on the trustee defendants' outright denial of an in-kind distribution in favor of a cash payment, her assertions regarding the non-discretionary character of the Plan's provisions governing the type of distribution available (cash versus in-kind), and the trustee defendants' misreading and misapplication of those provisions, would carry considerable weight. However, because the trustee defendants ultimately reversed their initial position and agreed that the Plan called for participants, and not the Plan administrator, to elect the type of distribution, the proper focus here is on the substance of the Property Distribution Procedure and how the trustee defendants came to adopt it.

The defendants accurately observe that the Plan expressly and unambiguously authorizes the trustee defendants to promulgate rules and regulations to implement the Plan's provisions. Section 2.6 of the Plan, which sets forth the powers and duties of the plan administrator, provides in relevant part: "The Administrator shall administer the Plan in accordance with its terms and shall have the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan." In addition to other responsibilities, § 2.6(e) authorizes the Plan administrator to "interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan as are consistent with the terms hereof."

The court agrees with the defendants that the Property Distribution Procedure for in-kind distribution is precisely the sort of "rule[ ] for regulation of the Plan" contemplated by § 2.6(e). Thus, the court concludes that the trustee defendants' adoption of the Property Distribution Procedure was a discretionary act warranting arbitrary and capricious, rather than *de novo*, review under *Firestone*.

The plaintiffs point to another provision of the Plan, § 6.5(a)(1),[2] to convince the court that under the Plan's distribution language Mr. Sahlie "was at the very least entitled to an inkind distribution of an undivided interest in each real property asset held by the plan," a distribution that the trustee defendants denied him by adopting the Property Distribution Procedure. This effort is unavailing, however, because § 6.5(a) merely entitles participants to elect between a "lump-sum payment in cash or in property," but neither it, nor any of the other Plan provisions, explicitly defines the precise form that an "in property" payment is to take. Instead, this determination is left to the sound discretion of the Plan administrator, as provided in §§ 2.6(b) (administrator is charged with the duty to "compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any Participant shall be entitled hereunder") and (e) (discussed above). Thus, while the court agrees with the plaintiffs that the trustee defendants were without discretion to decide which type of distribution Mr. Sahlie or any other participant may receive, that is, whether the distribution will be in-cash or in-kind, it concludes that the Plan provides them with clear authority to determine the precise form that such a distribution will take. The Property

---

2. Section 6.5(a), entitled "Distribution of Benefits," provides in relevant part:
 "The administrator, pursuant to the election of the Participant, shall direct the Trustee to distribute to a Participant or his Beneficiary any amount to which he is entitled under the Plan in one or more of the following methods:
 (1) One lump-sum payment in cash or in property;...."

Distribution Procedure adopted by the trustee defendants simply establishes guidelines for how the administrators are to exercise this authority.

The plaintiffs base their final argument in support of a *de novo* standard of review upon the Internal Revenue Service (IRS) regulations governing employee benefit plans. They rely on 26 C.F.R. § 1.411(d)–4 to assert that the IRS regulations prohibit the Plan from imposing "employer discretion"[3] or "objective conditions" on a participant's election of benefits, and that no conditions may be adopted to restrict any existing conditions governing such an election of benefits. The plaintiffs further contend that the Property Distribution Procedure adopted by the trustee defendants impermissibly imposes such conditions on the participants' choice of an in-kind distribution of Plan assets, which would disqualify the Plan under the Internal Revenue Code. Such disqualification, the plaintiffs argue, would in turn violate § 2.6 of the Plan, which requires that the administrator's actions be "consistent with the intent that the Plan shall continue to be deemed a qualified plan under the terms of [Internal Revenue] Code Section 401(a)."

While this argument does enjoy surface plausibility, it cannot withstand closer scrutiny. The IRS regulations cited by the plaintiffs establish only that a benefits plan may not be amended to add employer discretion or impose conditions that restrict the "availability" of certain benefits. *See* 26 C.F.R. § 1.411(d)–4 (Q & A #7). That is, plans providing for participants to elect among different distribution options, like the Plan at issue here, are prohibited by the regulations from: (1) granting the administrator or trustees the discretion to determine whether a participant may in fact elect one of the available options, or (2) establishing conditions that a participant must satisfy in order to receive her elected option, after it has

already accrued. The Property Distribution Procedure adopted by the trustee defendants achieves neither of these forbidden results, because in no way does it impinge upon the participant's right to choose between the two available options, in-cash or in-property payments. Rather, as explained above, the Property Distribution Procedure merely governs the precise form that an in-kind distribution may take.

Thus, because it finds that the trustee defendants' adoption of the in-kind distribution Property Distribution Procedure was a discretionary act under the Plan's provisions, the court will review this action under the arbitrary and capricious standard. The exact nature of this review will depend on whether the court finds that the trustee defendants were subject to a conflict of interest when they adopted the Property Distribution Procedure, as explained more fully below.

#### (b) Valuation of the Plan's Real Property Assets

■ The second action challenged by the plaintiffs in their § 1132(a)(1)(B) claim is the trustee defendants' alleged under-valuation of the Plan's real property assets in their July 31, 1996, appraisal. The court notes at the outset that the plaintiffs' decision to position this challenge as one for the recovery of benefits is somewhat odd, because the Sahlies have elected distribution in the form of real property, and not as a cash payment based upon the fair market value of Mr. Sahlie's balance under the Plan.[4] If Mrs. Sahlie receives the distribution of Mr. Sahlie's account balance in the form of real property as specified in the Property Distribution Procedure, any under-valuation of the Plan's property will not adversely affect the value of the distributed property. The properties distributed to Mrs. Sahlie would have their fair market values, irrespective of any under-valuation by the trustee defendants.[5] Mrs. Sahlie would only be adversely affected, and

---

3. The IRS regulations define the term "employer" to include plan administrators, fiduciaries and trustees. *See* 26 C.F.R. § 1.411(d)–4 (Q & A # 5).

4. The alleged under-valuation of the Plan's assets is properly the subject of Counts II and III of the complaint, which allege breach of the trustee defendants' fiduciary duties and violations of ERISA and Plan provisions.

5. This assumes that the plaintiffs claim an across-the-board under-valuation of the Plan's real property. If, however, only a subset of the properties have been under-valued, and Mrs. Sahlie's eventual in-kind distribution only contains properties that had not been under-valued, she would be adversely affected by the under-valuation even though her distribution is not in-cash.

the trustee defendants correspondingly enriched, if the Sahlies receive their distribution in the form of cash, while the Plan maintains possession of the under-valued property for eventual sale or valuation at the true fair-market value.

Nonetheless, the court finds that Mrs. Sahlie does state a colorable claim under § 1132(a)(1)(B) because she is entitled to a distribution based on an accurate valuation of Plan assets, and because she asks, in her demand for relief, for an in-cash distribution of Mr. Sahlie's account balance as an alternative form of relief.

The parties do not dispute that the court should review the trustee defendants' valuation of the Plan's real property assets on an arbitrary and capricious basis. The court agrees that this is the appropriate standard, given the unambiguously discretionary nature of § 5.2 of the Plan, which authorizes the Plan trustee to appraise real property "itself, or in its discretion, employ one or more appraisers for that purpose and rely on the values established by such appraiser or appraisers." The real dispute regarding the court's review of the valuation arises as a result of the plaintiffs' allegations that a conflict of interest colored the trustee defendants's approach to appraising the real property assets. This critical issue will be taken up below.

### (c) Denial of Reimbursement for Expenses in Pursuit of Claim

■ The third challenge leveled by the plaintiffs against the trustee defendants concerns their denial of Mrs. Sahlie's claim for reimbursement of the expenses she and Mr. Sahlie incurred while prosecuting their claim with the Plan. Mrs. Sahlie contends that her efforts and those of her husband convinced the trustee defendants to retreat from their original position that in-kind distributions were not contemplated by the Plan provisions, and to establish a procedure for in-kind distribution that is an "improvement" over the previous policy. Consequently, Mrs. Sahlie takes the position that she should be reimbursed for her and her husband's expenses, including attorney's fees, incurred while bringing about these changes in Plan

policy. Mrs. Sahlie points to no provision of the Plan in support of her demand for reimbursement, but relies instead upon a request made by her attorney during the course of the prosecution of her claim with the Plan, to which the trustee defendants never responded.

The court agrees with the trustee defendants' observation that the Plan nowhere contemplates the sort of reimbursement requested by the Sahlies. The plaintiffs have not responded to nor offered any arguments to counter the defendants' contention on this point. In fact, in a letter clarifying the Sahlies' positions drafted in anticipation of their administrative hearing, the Sahlies' attorney conceded that they "do not expect or want the Plan to reimburse them for those expenses; rather, they expect Bama Wood or the trustees to pay for reimbursement." [6]

Thus, the court concludes that the claim for reimbursement does not constitute a claim for benefits under the Plan, and is not properly brought under 29 U.S.C.A. § 1132(a)(1)(B). That provision, on its face, is limited to the recovery of benefits "under the terms of [the] plan." *See Hamilton v. Mecca, Inc.,* 930 F.Supp. 1540, 1554 (S.D.Ga. 1996) (§ 1132(a) "limits a plaintiff's recovery to the contractually-defined benefits that the plaintiff has been denied under his or her ERISA plan."). If the Sahlies have any right to reimbursement for their expenses, vindication of that right more appropriately would be pursued on the basis of a contract or other claim. Accordingly, Count I will be dismissed as to the Sahlies' claim for reimbursement of their expenses arising from the prosecution of their claim for benefits under the Plan. The court takes no position, however, regarding whether the expenses are recoverable on the basis of the plaintiffs' claims in Counts II and III of their complaint, which are not at issue in the motion for partial summary judgment currently before the court.

### (d) Denial of Post–Valuation, Pre–Distribution Interest and Earnings on Bill Sahlie's Account Balance

■ The final challenged action of the trustee defendants is their alleged refusal to

---

**6.** During the administrative appeal hearing itself, counsel for the Sahlies again conceded this point, stating that the request for reimbursement was "not a benefit claim under the plan."

award Mrs. Sahlie any interest or other earnings on Mr. Sahlie's account balance that accrued between the July 31, 1996, valuation and the actual time that the distribution is made. The trustee defendants protest that they have elected, pursuant to the relevant Plan provision, to segregate Mr. Sahlie's account balance, effective October 17, 1996, and invest it in interest-bearing investments pending distribution, so that Mrs. Sahlie will indeed obtain post-valuation interest on the account balance. The trustee defendants further point out that neither the Plan nor ERISA requires that they make such a pre-distribution interest payment. Additionally, they cite two district court decisions, *Jordan v. Retirement Comm.*, 875 F.Supp. 125, 128 (N.D.N.Y.1995), and *DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund,* No. 90 Civ. 5299(MJL), 1997 WL 26292, at **12–13 (S.D.N.Y. Jan. 22, 1997), in support of their position that where a plan administrator is not obligated by the plan or ERISA to make such a payment, but nevertheless opts to do so, the decision should not be found to be arbitrary and capricious.

The court agrees with the trustee defendants. The Plan at issue here does not mandate the payment of pre-distribution earnings and interest, but instead contemplates that payment be made based upon the latest annual valuation figures. While the Plan does permit the administrator to segregate and invest an account balance after valuation, so that the participant earns all interest that accrues prior to the actual date of distribution, the defendants correctly observe that the Plan vests the administrator, and not the participant, with discretion to do so. Here the trustee defendants did opt to segregate Bill Sahlie's account balance in October 1996. Consequently, the holdings in *Jordan* and *DeVito*, where the courts refused to find that the administrators had acted in an arbitrary and capricious manner in awarding interest payments that the participants complained were too low, are apposite here. Those courts concluded, and this court agrees, that where a plan neither requires interest payments on withheld benefits nor prescribes any method of calculating such interest, and ERISA is silent on the issue, the decision to deny interest payments on withheld benefits could not be considered

unreasonable under any standard of review. See *DeVito*, 1997 WL 26292, at *13; *Jordan*, 875 F.Supp. at 128; *but see Hizer v. General Motors Corp., Allison Gas Turbine Div.*, 888 F.Supp. 1453, 1461–62 (S.D.Ind.1995) (reaching opposite result on the basis of Seventh Circuit decisions governing prejudgment interest, and the court's conclusion that there is no apparent "rationale for drawing a distinction between prejudgment interest and interest on delayed payments").

The court also notes, once again, that the plaintiffs have failed even to mention this issue, let alone proffer any arguments or offer any evidence against the defendants' contentions, in their opposition brief. For this and the foregoing reasons, the court holds that Count I will be dismissed as to the Sahlies' claim for post-valuation, pre-distribution interest and earnings in addition to the amount that Mr. Sahlie's account balance has accrued since being segregated and invested by the trustee defendants on October 17, 1996.

### iii. Conflict of Interest

■ The court's conclusion that the two surviving challenged actions of the trustee defendants, adoption of the Property Distribution Procedure for in-kind distributions and the valuation of the Plan's real property assets, must be reviewed under the arbitrary and capricious standard does not end the analysis regarding the applicable standard of review. Although in applying this standard the court must give a significant degree of deference to trustee defendants' interpretations and determinations, if the court finds that their actions were tainted by a self-interest that conflicts with those of the Plan's participants, the arbitrary and capricious review must be modified to account for this conflict of interest. See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 116, 109 S.Ct. 948, 957, 103 L.Ed.2d 80 (1989); *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1481 (11th Cir.1995); *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1549–52 (11th Cir.1994); *Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1566 (11th Cir.1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). Here, the

plaintiffs assert that such a conflict of interest has prompted the trustee defendants to abrogate their duties and responsibilities to the Plan participants in favor of their own self-interest, resulting in both the imposition of unfair regulations on the distribution of in-kind assets and the under-valuation the Plan's real property assets. Thus, as required by the decisions cited above, before subjecting the actions of the trustee defendants to review under the arbitrary and capricious standard, the court must first determine whether the conflict of interest alleged by the plaintiffs actually existed.

The unique facts presented in this case render the determination of whether the trustee defendants' actions were tainted by a conflict of interest a novel and difficult one. Here the court is not confronted with the conventional denial-of-ERISA-benefits scenario, in which the complainant is one of a large number of individual participants in an immense benefits plan. Under such circumstances, the conflict of interest typically arises from the fact that the plan administrator is also the entity responsible for payment of the claim, as where a health care plan is both administered and funded by an insurance company. *See Brown,* 898 F.2d at 1561–62 ("Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business.... [I]t is exercising discretion over a situation for which it incurs 'direct, immediate expense as a result of benefit determinations favorable to [p]lan participants.' ") (quoting *de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1191 (4th Cir.1989)). Instead, here the plan is a relatively small one, in terms of the number of participants, and the accounts of the trustee defendants, who act as both the trustees and administrators of the Plan, collectively constitute a considerable percentage of the Plan's assets. In fact, the record before the court, although

incomplete because it lacks the July 31, 1996, figures, establishes that once Bill Sahlie's account is distributed, the trustee defendants' account balances will comprise greater than one-half of the entire assets of the Plan. Thus, the trustee defendants collectively appear to be the largest future beneficiaries of the Plan. According to the plaintiffs, this situation inherently creates a substantial conflict of interest, because the trustee defendants have a "direct pecuniary interest in the results of their decisions" regarding the size and nature of the distribution they make on Bill Sahlie's account. The plaintiffs' argument regarding the trustee defendants' financial stake in the outcome of the Sahlie distribution may be reduced to a simple equation: the less cash they distribute to Bill Sahlie, or the less valuable the real property they provide him, the greater the value of the retained assets in the Plan, which eventually will be reaped by the future beneficiaries, at the Sahlies' expense.[7]

Not surprisingly, the trustee defendants vigorously deny that such a conflict of interest plagued their decisions regarding the distribution of Bill Sahlie's account. They seek to persuade the court that the plaintiffs' reasoning is illogical, because an under-valuation of the Plan's assets would be equally detrimental to the trustee defendants if an unexpected event required that their account balances be distributed. In such an event, the trustee defendants point out, the most recent valuation of the Plan's assets would also govern the size of their distributions, and they too would be victimized by any under-valuation of assets.[8]

The court acknowledges that when faced with conflict of interest allegations stemming from a plan administrator's stake as a future beneficiary in the outcome of a benefits determination, other courts have held that no presumptive conflict exists. *See Woolsey v. Marion Laboratories, Inc.,* 934 F.2d 1452,

---

7. In their opposition brief, the plaintiffs provide a hypothetical example purporting to demonstrate how, in real monetary terms, the trustee defendants would "substantially benefit from an undervaluation and termination of Bill Sahlie's account."

8. To make their point more concrete, the trustee defendants point to one from among their own

ranks, M.D. Nolen, Jr., who has been receiving installment distributions of his retirement benefits under the Plan. The trustee defendants argue that these payments would be directly and adversely affected by any under-valuation of the Plan's assets, so that it is untenable to conclude that Mr. Nolen and his cohorts would purposely understate the assets' actual value.

1459–60 (10th Cir.1991) (finding no presumptive conflict of interest, despite administrators' status as future beneficiaries, where administrators denied participant's request that one-half of his distribution be made in stock, rather than cash); *May v. Roadway Express, Inc.*, 813 F.Supp. 1280, 1286 (E.D.Mich.1993) ("tenuous relationship" between administrators' decision to deny participant unvested shares of stock and the benefit, if any, to the administrators as stock plan beneficiaries held insufficient to establish presumptive conflict of interest). Nonetheless, the court finds that the plaintiffs here raise substantial questions of fact as to whether the trustee defendants were subject to a conflict of interest when they determined the outcome of Bill Sahlie's distribution request. Several considerations lead the court to reach this conclusion. The evidence before the court indicates that the trustee defendants are not typical, small-scale future beneficiaries; instead, collectively they are destined eventually to receive a substantial proportion (in the neighborhood of 50%) of the Plan's assets. Consequently, it is logical to assume that they can feel the pecuniary impact of their fiduciary decisions more directly than would administrators/future beneficiaries who have small accounts in a large benefits plan divided among numerous participants. Moreover, such an effect would be magnified here, where the claim for benefits under the Plan was made by the single largest account holder; thus, even a slight under-valuation of Bill Sahlie's account could create a significant potential windfall for the trustee defendants.

As noted above, the plaintiffs' assertion that this situation creates a genuine conflict of interest is vigorously contested by the trustee defendants, who claim that their interests were at no time adverse to those of the other participants, including Bill Sahlie. However, despite the trustee defendants' protestations that they too would suffer the unfavorable consequences of an under-valuation of Plan assets if for some reason their accounts were to be distributed within a year of the incorrect appraisal, the evidence before the court could be understood to establish that the trustee defendants had wagered that their distributions would not be made until much later (e.g., upon their retirement).

Thus, it is not beyond legitimate dispute that the trustee defendants, when they appraised the Plan's assets, were indeed acting in their own self-interests, comfortable in the expectation that no twist of fate would prevent them from eventually reaping the financial windfall created by their under-valuation of Bill Sahlie's account.

For the foregoing reasons, the court holds that it cannot conclude as a matter of law that the trustee defendants were not subject to a conflict of interest. Accordingly, the trustee defendants' motion for partial summary judgment must be denied as to the plaintiffs' § 1132(a)(1)(B) claims regarding the adoption of the Property Distribution Procedure and the July 31, 1996, valuation of the Plan's assets. For the time being, therefore, the court cannot reach the ultimate issue of whether these actions of the trustee defendants were arbitrary and capricious. *See Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1257 (2d Cir.1996) (question of whether a conflict of interest existed and its effect on administrator's decision precluded summary judgment on denial of benefits claim; court employed an arbitrary and capricious standard that differs somewhat from that of the Eleventh Circuit). However, in the interest of providing meaningful guidance to the parties, the court offers a few words here regarding the analytical framework to be used in deciding that issue.

The Eleventh Circuit has made it quite clear that where a plan administrator has been adjudged to have operated under a conflict of interest in determining the outcome of a claim for benefits, the standard of review must be adjusted to reflect the conflict. *See Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1481 (11th Cir.1995); *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1549–52 (11th Cir.1994); *Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1566 (11th Cir.1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). The Eleventh Circuit has described the burden-shifting approach that is to be applied in this situation as follows. First, the court must evaluate whether the interpreta-

tion of the plan proffered by the claimant is reasonable. *Florence Nightingale,* 41 F.3d at 1481. If the claimant's interpretation is deemed reasonable, the court next applies the principle of *contra preferentum,* construing any ambiguities in the plan's provisions against the administrator, to find that the administrator's interpretation is wrong. *Id.* Next, the court determines whether the administrator was arbitrary and capricious in adopting its incorrect interpretation. In so doing, the court places the burden upon the administrator to establish that its action was not tainted by any self-interest. *Id.* Even a reasonable interpretation will be found arbitrary and capricious if the administrator cannot demonstrate that its decision was not motivated by self-interest. If the administrator does manage to carry this burden, the claimant may still succeed if the action is deemed arbitrary and capricious by other measures. *Brown,* 898 F.2d at 1568.

Of course, the court will be required to adapt this burdenshifting approach to the unique factual setting of the case at bar. To do so, it will be necessary to consider the two surviving elements of the plaintiffs' claim for denial of benefits separately. Regarding the adoption of the Property Distribution Procedure for in-kind distributions, the court will first determine whether the in-kind distribution procedure requested by the Sahlies constitutes a reasonable interpretation of the Plan's provisions governing distributions. According to the Eleventh Circuit's description of this test, the Sahlies' interpretation must be deemed "one that can rival" that of the trustee defendants. *See Brown,* 898 F.2d at 1570. If the Sahlies can satisfy this standard, then the court must apply the principle of *contra proferentum* prescribed by the Eleventh Circuit, and find that the trustee defendants' interpretation is incorrect. Next, if the trustee defendants were found to have been subject to a conflict of interest, the burden will shift to them to establish that their adoption of the Property Distribution procedure was not tainted by their self-interest. The analysis generally will be the same regarding the alleged under-valuation of the Plan's real property assets, except that the court first will be required to gauge the reasonableness of the plaintiffs' proposed appraisal of the assets.

It also bears mention here that the court, if it finds that the trustee defendants acted under a conflict of interest, will subject any factual determinations made by the trustee defendants in adopting the Property Distribution Procedure and in appraising the Plan's real property assets to review under the same modified arbitrary and capricious standard described above. *See Newell v. Prudential Ins. Co.,* 904 F.2d 644, 652 (11th Cir.1990) (modified arbitrary and capricious standard applied to benefits determination outside of plan interpretation context); *Cargile v. Confederation Life Ins. Group Plans,* 748 F.Supp. 874, 878 n. 2 (N.D.Ga.1990) (same); *see also Torre v. Federated Mutual Ins. Co.,* 854 F.Supp. 790, 815–16 (D.Kan. 1994) (because "[a] conflict of interest makes an administrator's factual determinations suspect for the same reasons its plan interpretations are suspect," the modified arbitrary and capricious standard is applied to factual determinations).

## COUNT IV: PLAINTIFFS' CLAIM REGARDING REFUSAL TO SUPPLY REQUESTED INFORMATION UNDER 29 U.S.C.A. § 1132(c)

In Count IV of their complaint, the plaintiffs seek relief under 29 U.S.C.A. § 1132(a)(1)(A) and (c) for the alleged failure of the trustee defendants, acting as Plan administrators, to provide them with requested information regarding the Plan. Pursuant to § 1132(c)(1),

"Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material ... within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."

29 U.S.C.A. § 1132(c)(1).

Thus, the principal issue raised by the plaintiffs' § 1132(c) claim is whether the re-

quested information was of the type that administrators are required to provide under the statute. To resolve this question, the court must turn to another ERISA provision, § 1024(b)(4), which specifies as follows the documents that a plan administrator must furnish to participants upon request: "the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C.A. § 1024(b)(4).

The record before the court, although less than absolutely clear, does establish that the plaintiffs' claim under § 1132(c)(1) concerns two distinct sets of information: (1) a list of the account balances of all participants in the Plan; and (2) correspondence between the trustee defendants and two governmental entities, the Department of Labor and the Internal Revenue Service, concerning the Plan. Apparently, the latter correspondence was provided to the plaintiffs during discovery in this action, but not within the 30 days prescribed by the statute. The trustee defendants, however, continue to refuse to furnish the list of account balances.

 29 U.S.C.A. § 1024(b)(4) does not explicitly include the documents that the plaintiffs have requested among the list of those that are to be furnished to participants on demand. Moreover, regarding the requested correspondence between the Plan and government entities, even the broadest category of documents enumerated in § 1024(b)(4), "other instruments under which the plan is ... operated," cannot reasonably be read to encompass such documents. However, because the list of account balances requested by the plaintiffs arguably does fall within this category of documents that must be furnished upon request, further examination is required.

Several courts have grappled with the question of § 1024(b)(4)'s scope, and have reached inconsistent conclusions. The most expansive reading of the section was set forth by the Sixth Circuit in *Bartling v. Fruehauf Corp.*, 29 F.3d 1062 (6th Cir.1994). In that decision, the court concluded that, because "the purpose of ERISA's disclosure requirements is to ensure that 'the individual participant knows exactly where he stands with respect to the plan,' ... all other things being equal, courts should favor disclosure [pursuant to § 1024(b)(4) ] where it would help participants understand their rights." *Id.* at 1070 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 118, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989)). Application of this standard led the *Bartling* court to conclude that "actuarial valuation reports," as required by § 1023, are instruments under which the plan is operated and so must be disclosed upon request pursuant to § 1024(b)(4). *Id.*

At the opposite extreme of the interpretive spectrum, the Fourth Circuit concluded in *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653–54 (4th Cir.1996), that the "other instruments" category of § 1024(b)(4) includes "only formal or legal documents under which a plan is set up or managed." The *Faircloth* court expressly rejected the Sixth Circuit's expansive reading of this section, and instead interpreted its "clear and unambiguous statutory language" to exclude "appraisal or valuation reports," because the plan in question was not set up or managed under those documents. *Id.* at 654. The Second Circuit has concurred in this conclusion, emphasizing that the use of the preposition "under" in the § 1024(b)(4) phrase "instruments under which [a] plan is ... operated," rather than "with" or "through," establishes that "Congress meant the formal legal documents that govern or confine a plan's operations, rather than the routine documents with which or by the means of which a plan conducts its operations." *Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142 (2d Cir.1997).

The Ninth Circuit's reading of § 1024(b)(4), in *Hughes Salaried Retirees Action Comm. v. Administrator of the Hughes Non–Bargaining Retirement Plan*, 72 F.3d 686 (9th Cir.1995) (en banc), *cert. denied*, —— U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996), falls somewhere in between the two extremes staked out by its sister circuits, but closer to the restrictive end than the expansive end of the spectrum. The *Hughes* court en banc refused to read the section, as had the original panel, to

require disclosure of all documents that are "critical to the operation of the plan,'" because such a reading "admits of no limiting principle." 72 F.3d at 690. Instead, the court interpreted § 1024(b)(4) to require the disclosure of "only the documents described with particularity and 'other instruments' similar in nature." *Id.* at 691. This construction of the statute led the *Hughes* court to conclude that a list of participants' names and addresses is not a document contemplated by § 1024(b)(4). The court apparently was motivated, at least in part, by the fact that such a list, unlike the documents specifically enumerated in the section, "provide[s] no information about the plan or benefits." *Id.* at 690.[9]

The Eleventh Circuit has not yet staked out its position on the interpretive spectrum described above. However, even if this Circuit were to adopt an interpretation of § 1024(b)(4) as expansive as that of the Sixth Circuit in *Bartling,* the information requested by the plaintiffs would not fall within the purview of "instruments under which the plan is ... operated." At issue here is not the annual valuation report, or even the appraisal figures and calculations that underlie this report—the plaintiffs have not established that such information has not already been produced. Rather, the plaintiffs seek disclosure of the precise account balance information for each individual plan participant, claiming that this information is necessary for them "to understand fully the [trustee defendants'] in-kind distribution proposal and to ensure that Bill Sahlie's account balance as of July 31, 1996, had been

properly determined...." The court does not understand how the complete listing of account balances will serve this purpose, however, because it is the calculation of Mr. Sahlie's account, not those of the other Plan participants, that is at issue here. The plaintiffs have not satisfied the court that the information regarding the other participants' exact account balances is necessary to ensure that the Sahlies "know[ ] exactly where [they] stand[ ] with respect to the plan." *See Bartling,* 29 F.3d at 1070.[10]

Accordingly, the court will grant the defendants' motion for partial summary judgment as to Count IV of the complaint, and will dismiss the plaintiffs' claim under § 1132(a)(1)(A) and (c) regarding the trustee defendants' refusal to supply requested information.

## IV. CONCLUSION

For the foregoing reasons, it is ORDERED that the motion for partial summary judgment filed by the defendants on June 30, 1997, is granted in part and denied in part as follows:

(1) Is granted as to Count I against defendants Bama Wood, Inc., and Benny F. Nolen, M.D. Nolen, Jr., and G.J. Harris in their individual capacities;

(2) Is granted as to the following aspects of Count I:(a) the denial of plaintiff Shirley P. Sahlie's claim for reimbursement of the expenses she and Bill Sahlie incurred while prosecuting their claim; and (b) the denial of plaintiff Shirley P. Sahlie's claim for post-

---

**9.** In *Hughes,* unlike the case at bar, the participants requested the list of retired participants' names and addresses not to investigate the status of their distributions or the management of the plan, but rather to communicate with the retirees "about matters of concern to all retired participants regarding their pensions...." 72 F.3d at 688.

**10.** The court emphasizes that it has not taken a position regarding how expansively the "other instruments" provision of § 1024(b) is to be construed. Rather, the court merely has concluded that even under the most expansive reading adopted by the Courts of Appeals the full list of Plan participants' account balances is not included within the scope of that provision.

The court also notes that the trustee defendants' contention that they should not be re-

quired to disclose the individual account balances due to privacy concerns is unfounded, because simple redaction of the name and address information from the list would alleviate such concerns, while still providing the Sahlie's with the account balance information they seek. *Cf. Mitchell v. American Hardware Mfrs. Ass'n,* No. 84 C 444, 1985 WL 2559, at *10 (N.D.Ill. Sept.16, 1985) (because redaction would protect others' privacy interests, participant should have been provided information regarding the vesting of other employees' accounts under § 1133); *Sage v. Automation Inc. Pension Plan and Trust,* 845 F.2d 885, n. 4 (10th Cir.1988) (also under § 1133, disclosure required where redaction of employees' compensation figures satisfies confidentiality concerns).

valuation, pre-distribution interest and earnings on Bill Sahlie's account balance.

(3) Is denied as to the following aspects of Count I:(a) the adoption of the Property Distribution Procedure for in-kind distribution by the Plan administrator and the denial of plaintiff Shirley P. Sahlie's request for a different form of in-kind distribution; and (b) the alleged under-valuation of the Plan's real property assets in the July 31, 1996, annual valuation.

(4) Is granted as to the entirety of Count IV.