**Frankie E. LAKE, Plaintiff,**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

No. Civ.A. 98–T–1155–E.

United States District Court,
M.D. Alabama,
Eastern Division.

June 7, 1999.

Sam E. Loftin, Loftin, Herndon, Loftin & Miller, Phenix City, AL, for plaintiff.

Beverly P. Baker, Haskell, Slaughter, Young & Gallion, Birmingham, AL, Georgia S. Roberson, Haskell, Slaughter, Young & Gallion, Birmingham, AL, for defendants.

*MEMORANDUM OPINION*

MYRON H. THOMPSON, District Judge.

Plaintiff Frankie E. Lake filed this lawsuit in state court against defendant UNUM Life Insurance Company of America, under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001–1461, commonly known as "ERISA". Lake seeks to recover benefits allegedly due her under the Synovus Fi-

nancial Corporation Group Long–Term Disability Insurance Policy. Invoking the court's federal-question jurisdiction, UNUM removed the action to this court under 28 U.S.C.A. § 1441(b) and 29 U.S.C.A. § 1132(e)(1).

By agreement of the parties, this lawsuit has been submitted to the court for final judgment on the pleadings, the jointly submitted evidentiary record, and the parties' briefs. For the reasons that follow, the court finds in favor of Lake.

## I. FACTUAL SUMMARY

Lake is a beneficiary of an ERISA plan—the Synovus Financial Corporation Group Long–Term Disability Insurance Policy—which is administered by UNUM.[1] On July 29, 1994, Lake, then a 51–year–old executive vice-president of Synovus Securities,[2] a subsidiary of Synovus Financial Corporation,[3] reportedly passed out at work and was taken to a hospital by ambulance.[4] On November 2, 1994, an official of Synovus Financial Corporation asked UNUM to process a long-term disability-benefits claim for Lake under the ERISA plan.[5] In a letter dated November 22, 1994, UNUM notified Lake that her claim had been approved.[6] In accordance with the plan, Lake would receive 60% of her basic monthly earnings reduced by certain other income benefits such as Social Security and worker's compensation.[7] The letter also stated that Lake would continue to receive benefits as long as she remained

---

1. *See* Joint Evidentiary Record, filed February 5, 1999, at 3–24, 605. The insurance plan specifically designates Synovus Financial Corporation as the plan administrator. *See id.* at 588. The parties, however, do not dispute that UNUM has made all of the decisions relating to Lake's eligibility for benefits under the insurance plan and that UNUM has acted as the administrator of the plan. *See* Plaintiff's brief, filed February 19, 1999, at 2; Defendant's brief, filed March 5, 1999, at 15.

2. *See* Joint Evidentiary Record, filed February 5, 1999, at 124.

3. *See id.* at 19.

4. *See id.* at 315.

5. *See id.* at 76.

6. *See id.* at 106.

7. *See id.*

'disabled' and that she would periodically have to provide UNUM with proof of her continued disability.[8]

Also in November 1994, Lake visited Dr. Thomas Walsh because she was experiencing low back pain and bilateral leg numbness.[9] Lake had previously undergone two surgeries to repair ruptured lumbar disks, the first sometime between 1985 and 1988[10] and the second in March 1994.[11] After examining Lake and reviewing her x-rays, Dr. Walsh reported the following: significant disk desiccation at L4–L5 and L5–S1, some deformity and flattening of the left S1 nerve root at the L5–S1 level, and a severe L5–S1 disc-space narrowing.[12] He also noted that Lake was obviously in considerable pain and depressed.[13] Dr. Walsh and Lake discussed the possibility of surgery, should her condition not improve after a few weeks of rehabilitation therapy.[14] On December 19, 1994, because Lake's condition had not improved, Dr. Walsh operated on her.[15] The surgery involved a revision of and L5, total decompressive laminectomy, and L4–to–S1 instrumented posterolateral fusion with iliac crest autograph.[16]

Four weeks later, on January 17, 1995, Dr. Walsh examined Lake.[17] Dr. Walsh stated that Lake is "doing quite well" and, other than intermittent tingling in the toes on her right foot, has "no complaints."[18] Dr. Walsh examined Lake again on February 14, 1995, and March 16, 1995.[19] In February, Dr. Walsh noted that Lake had a lumbar strain and contusion from a fall onto her buttocks the previous week, but was recovering well from surgery.[20] In March, Dr. Walsh noted that Lake was "doing quite well" and "appears without pain."[21]

On April 27, 1995, Dr. Walsh examined Lake again and noted the following:

"Only complaint now is left iliac bone graft donor site pain. Otherwise the leg pain is gone and she is quite pleased with her symptomatic improvement. She is doing physical therapy three days a week, going to the Pastoral Institute for some emotional counseling twice a week which I think is excellent. Because of her high stress and demand job she is having thoughts of retiring but not for reasons of her back. Her x-rays show excellent progressive bone graft consolidation and intact hardware."[22]

After receiving a copy of this note, UNUM, in a letter to Lake dated May 9, 1995, stated, "Based on Dr. Walsh's 4/27/95 office treatment note, we have suspended your disability benefit payments effective 4/30/95. . . . [I]f you wish to supply proof of further disability, please do so by 5/27/95. If no further medical proof of disability is received, your claim will be closed on that date."[23]

Based on UNUM's invitation to supply proof of further disability, Lake had her

8. *See id.* at 105–06.

9. *See id.* at 100.

10. *See id.* at 100, 315.

11. *See id.* at 69.

12. *See id.* at 99.

13. *See id.* at 99–100.

14. *See id.* at 98.

15. *See id.* at 448–53.

16. *See id.* at 449.

17. *See id.* at 431.

18. *Id.*

19. *See id.* at 431–32.

20. *See id.* at 431.

21. *Id.* at 432.

22. *Id.* at 433.

23. *Id.* at 138.

psychiatrist, Dr. George Zubowicz, and her psychologist, Dr. Janice Ryan, jointly complete and submit to UNUM an 'additional physician's statement'.[24] Beginning in September 1994, Lake frequently saw Drs. Zubowicz and Ryan for treatment of depression.[25] In their statement, Drs. Zubowicz and Ryan diagnosed Lake's condition as dysthymia,[26] which is a mental condition having as its "essential feature ... a chronically depressed mood that occurs for most of the day more days than not for at least 2 years."[27] They listed Lake's symptoms as excessive weeping, feelings of inadequacy, inability to make decisions regarding career, feelings of hopelessness, anger, unresolved childhood grief, and poor concentration.[28] The statement indicates that "degenerative spinal disorder/disease" is a secondary condition contributing to her disability.[29] Drs. Zubowicz and Ryan described what Lake could not and should not do as follows: "(1) Cannot make major decisions regarding high financial outcomes[;] (2)[c]annot cope [with] conflicted situations evolving in stressful business meetings[;] (3)[c]annot deal with anxiety that overwork will impose on her physical condition[; and] (4)[c]annot do any intense physical movement/work simply to include 'hurrying.' "[30]

UNUM received Drs. Zubowicz and Ryan's statement on May 24, 1995.[31] On June 5, 1995, UNUM wrote to Lake stating that it did not have sufficient information to determine whether she had a further disability.[32] The letter also stated that UNUM had reinstated Lake's monthly benefit payments under a reservation of rights while it further investigated her condition.[33]

UNUM eventually elected to have Lake undergo an independent medical examination by Dr. David Prichard, a psychologist.[34] In its November 13, 1995, letter to Dr. Prichard, UMUM stated:

"We do not understand the nature or extent of [Lake's] mental/nervous impairment. The insured claimed mental/nervous disability when she recovered from her prior physical impairment.... Although the mental/nervous condition was mentioned in treatment notes prior to her recovery, there was no indication of mental/nervous work impairment. Certification of the mental/nervous impairment has been inadequate to date. The attending physician/counselor states that the patient cannot return to work at this time, although [the] reasons are not entirely clearly outlined or supported in treatment notes."[35]

UNUM's letter asked Dr. Prichard to respond to three specific questions:

"1. What is the nature and extent of Ms. Lake's mental/nervous impairment?

"2. Does [Lake] have work capacity for her own occupation? If not, why not?

**24.** See id. at 146–47.

**25.** See id. at 520–23; Plaintiff's brief, filed February 19, 1999, at 6.

**26.** See Joint Evidentiary Record, filed February 5, 1999, at 147.

**27.** American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* § 300.4 (4th ed.1994).

**28.** See Joint Evidentiary Record, filed February 5, 1999, at 147.

**29.** Id.

**30.** Id. at 146.

**31.** See id. at 147.

**32.** See id. at 153.

**33.** See id.

**34.** See id. at 293.

**35.** Id. at 291–92.

What sort of work capacity does she have?

"3. What treatment might help her mental/nervous condition and within what timeframe?" [36]

On December 2, 1995, Dr. Prichard interviewed and administered psychological tests to Lake.[37] He also reviewed several documents regarding Lake's medical history and, over the following week, conducted several collateral interviews.[38] In a letter dated December 8, 1995, Dr. Prichard forwarded the following conclusions and opinions to UNUM:

"1. Ms. Lake's current condition is best diagnosed as a) 307.89 Pain disorder associated both with psychological factors and a general medical condition, chronic, and b) 309.28 Adjustment disorder with mixed anxiety and depressed mood, chronic. Although her mental health records offer a diagnosis of dysthymia (9), this diagnosis is not applicable since her depressive state has not persisted for at least two years. Although her psychotherapist characterizes her condition as a major depressive episode (22), this diagnosis is not applicable since her depressive state appears to have been precipitated by her spinal surgery and associated pain.

"2. Ms. Lake is currently not coping well with her reported pain or with associated changes in activity level, activities and career. She has changed her lifestyle from that of a career-oriented, successful executive who enjoyed traveling and skiing to that of a socially isolated homemaker who is preoccupied with her perceived limitations. In addition, she is considering resigning from her 23–year employment with Synovus Corporation due to her perceived inability to cope with job stress. These changes are currently creating an 'identity crisis' that is manifest in dysphoria, problems concentrating, tearfulness and hostility.

"3. At the present time, Ms. Lake does not have the capacity to perform the material duties of her occupation as Executive Vice President of Synovus Corporation. Her current level of pain limits her ability to travel and to sit for extended periods of time without frequent breaks. Her current level of psychological distress impairs her ability to concentrate for extended periods of time. However, it is possible that, with appropriate treatment, she could resume her position as Executive Vice President or some other position within the corporation.

"4. Ms. Lake is not currently receiving appropriate treatment of her pain disorder or her adjustment disorder. It has apparently never been a goal of medical or psychotherapeutic treatment to assist Ms. Lake to cope effectively with the residual pain she experiences from her corrective surgeries. . . .

"5. Ms. Lake should be referred to a Pain Clinic where she can learn adaptive ways of coping with pain and anxiety without the necessity of abandoning her career. However, given that Ms. Lake is already close to deciding to resign from her position with Synovus (22), it is not clear how open she would be to this new therapeutic focus." [39]

On December 19, 1995, after receiving Dr. Prichard's report, UNUM informed Lake that it had accepted liability for her claim.[40] However, UNUM determined that Lake's disability had become "primar-

---

**36.** *Id.* at 291.

**37.** *See id.* at 316.

**38.** *See id.* at 315–16.

**39.** *Id.* at 312–13.

**40.** *See id.* at 318.

ily mental/nervous" as of April 30, 1995.[41] The plan limits benefit payments to a maximum of 24 months when they are based on a disability that is due to mental illness.[42] Consequently, her benefit payments would expire no later than April 30, 1997.[43]

Before it received Dr. Prichard's report, UNUM continued to receive Lake's medical records from Dr. Walsh. Between May 9, 1995, the date UNUM originally informed Lake that it had suspended her disability benefits, and December 1995, the date UNUM received Dr. Prichard's report, Dr. Walsh's notes indicate that Lake was recovering well from her December 1994 surgery, but that she periodically complained of back, leg, and buttock pain, and depression.[44]

UNUM also continued to receive Lake's medical records from Dr. Walsh after it had received Dr. Prichard's report. On December 19, 1995, Dr. Walsh administered a cortisone injection to Lake after she had complained of pain in her back, near the recent surgical site.[45] Lake continued to complain of back pain during the ensuing months.[46] Therefore, on May 29, 1996, Dr. Walsh again operated on Lake, this time removing the lumbar hardware which he had inserted into her during the previous surgery.[47]

During the three months following the May 29, 1996, surgery, Dr. Walsh's notes indicate that Lake's condition fluctuated. On June 20, 1996, Dr. Walsh noted that Lake "states she feels great with no pain."[48] On July 18, 1996, he reported that she had a "recurrence of her sacral area pain with radiation into the left anterior pelvic region."[49] On July 25, 1996, he noted that Lake is "[n]ow complaining of substantial pain over the left posterior superior iliac spine area, aggravated by walking and moving her hip[,] with some radiation down the lateral buttock and hip."[50] And on August 22, 1996, however, he said that Lake "is completely pain free now.... She feels 100% better. No requests. Follow-up in one year."[51]

Lake's next contact with Dr. Walsh's office was by telephone six months later. A telephone note from Dr. Walsh's office dated February 19, 1997, states that Lake "continues to have hip, pelvic and right anterolateral leg pain, numbness and tingling in the top of her foot into her three lateral toes.... She did try to go back to work at one point, but was unable to sit for prolonged periods of time...."[52]

On April 17, 1997, UNUM wrote to Lake to inform her that her disability benefits were at an end pursuant to the plan's 24-month mental-illness limitation.[53] Lake's benefit payments ceased on April 29, 1997.[54] In response, on September 15, 1997, Lake's attorney wrote to UNUM requesting that it reopen and reevaluate

41. *Id.*

42. *See id.* at 4, 594.

43. *See id.* at 318

44. *See id.* at 433–35.

45. *See id.* at 435.

46. *See id.* at 436.

47. *See id.* at 440–41.

48. *Id.* at 437.

49. *Id.*

50. *Id.*

51. *Id.* at 438.

52. *Id.* at 439.

53. *See id.* at 417–18.

54. *See id.* at 574.

Lake's claim.[55] Lake's attorney wrote: "The records clearly demonstrate that Mrs. Lake's psychological problems are a direct result of the continuing back pain she has and the problems of coping because she cannot work."[56] He specifically referred UNUM to Dr. Prichard's report, the March 13, 1997, claim form completed by Dr. Zubowicz, which Lake had submitted to UNUM,[57] and the February 19, 1997, telephone note from Dr. Walsh's office.[58] UNUM responded to Lake's attorney on October 27, 1997, stating that it would further investigate her claim before making a final decision.[59]

Soon thereafter, on December 2, 1997, UNUM wrote to Dr. Walsh asking him to answer specific questions about Lake's current medical condition and ability to return to work.[60] The questions were: "(1) What is Lake's current diagnosis and what are her current symptoms and how do these symptoms prevent her from working? (2) What are Lake's current restrictions and limitations? (3) Has Lake been released to return to work within these restrictions and limitations and, if not, please detail why? (4) What is Lake's current treatment plan and how is a return to work integrated into this plan?"[61]

On January 13, 1997, after not receiving a response from Dr. Walsh, UNUM wrote to Lake stating that it needed the information requested from Dr. Walsh in order to manage her claim.[62] UNUM wrote a similar letter to Lake's attorney on January 19, 1998.[63]

At the request of her attorney, Lake underwent a vocational evaluation by Dr. Michael McClanahan on January 6, 1998.[64] Dr. McClanahan categorized Lake's functional abilities as 'less than sedentary' and concluded that she must alternate postural positions every ten to 15 minutes and that she has difficulty with any activity that involves movement of the spine.[65] He also found Lake's pain assessment to be in the severe range, which is occupationally debilitating.[66] Lake's attorney sent Dr. McClanahan's report to UNUM on January 22, 1998.[67]

On January 26, 1998, Dr. Walsh responded to UNUM's inquiry.[68] He stated that he was in the process of reevaluating Lake, he would review the results of Dr. McClanahan's vocational rehabilitation report on February 3, 1998, and he would respond to UNUM's questions afterwards.[69] Dr. Walsh examined Lake on February 3, 1998.[70] Two weeks later, on February 18, 1998, Dr. Walsh responded to UNUM's four questions as follows: First, Lake's current diagnosis is chronic

55. *See id.* at 460–61.

56. *Id.* at 461.

57. In this form, Dr. Zubowicz reiterated his and Dr. Ryan's diagnosis and many of their findings stated in the their additional statement. *See id.* at 414–15.

58. *See id.* at 460–61.

59. *See id.* at 489.

60. *See id.* at 497–98.

61. *See id.* at 498.

62. *See id.* at 504.

63. *See id.* at 512.

64. *See id.* at 532.

65. *See id.* at 529.

66. *See id.*

67. *See id.* at 533.

68. *See id.* at 534.

69. *See id.*

70. *See id.* at 648.

discogenic low back pain and sciatic syndrome.[71] The resulting pain causes severe restrictions in her lifestyle and functional abilities.[72] Second, "I consider Ms. Lake permanently and totally disabled from any gainful or physical or mental employment."[73] Third, Lake has not been released to work and probably will not be.[74] Fourth, Lake's current treatment includes non-narcotic over-the-counter analgesics and low-impact exercise.[75] Along with his answers, Dr. Walsh sent UNUM his notes from his February 3, 1998, examination of Lake.[76]

One month later, on March 18, 1998, UNUM wrote to Lake's attorney stating: "We have completed our review and have determined that the termination of benefit payments on Ms. Lake's claim was appropriate."[77] UNUM reasoned:

> "The available medical records do not support the conclusion that Ms. Lake's back condition impaired her in any way on or around April 29, 1997, the last day she was eligible for benefits under the mental illness provision. Consequently, your contention that Ms. Lake's condition is primarily a physical impairment, and, therefore, not subject to the mental illness limitation, is unsupported."[78]

On May 15, 1998, Lake's attorney wrote to Synovus Financial Corporation stating that Lake would like to appeal UNUM's decision directly to the plan administrator.[79] Synovus Financial Corporation referred this letter to UNUM.[80] On July 2, 1998, UNUM responded to Lake's attorney by stating that by way of Lake's September 15, 1997, appeal and UNUM's response thereto on March 18, 1998, Lake had exhausted her right to appeal under ERISA.[81] Lake then filed this lawsuit in the Circuit Court of Russell County, Alabama on September 9, 1998. UNUM removed the case to this court on October 9, 1998.

## II. STANDARD OF REVIEW

As a threshold matter, the court must determine the proper standard of review to apply to UNUM's denial of long-term benefit payments to Lake. ERISA does not provide a standard of review for decisions of a plan administrator. The Eleventh Circuit, however, has adopted standards for reviewing both the plan administrator's plan interpretation and its factual determinations. Lake does not dispute UNUM's interpretation of the plan. Rather, only UNUM's factual determinations are at issue.

In *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446 (11th Cir.1997), the Eleventh Circuit Court of Appeals, conclusively addressing the issue for the first time, held that the arbitrary-and-capricious standard of review applies to a plan administrator's factual determinations. *See* 129 F.3d at 1451. "[W]here the plan affords the administrator discretion, the administrator's fact-based determinations will not be disturbed if reasonably based on the information known to the administrator at the time the decision was rendered." *Id.*

Here, as in *Paramore*, the insurance plan grants UNUM discretion.[82] Unlike in

---

71. *See id.* at 650.

72. *See id.*

73. *Id.*

74. *See id.*

75. *See id.*

76. *See id.* at 648–49.

77. *Id.* at 575.

78. *Id.* at 574

79. *See id.* at 608.

80. *See id.* at 626.

81. *See id.* at 625–26.

*Paramore,* however, UNUM has a conflict of interest because the plan's benefits are paid out of UNUM's assets, rather than a separate trust.[83] *See Brown v. Blue Cross and Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1561 (11th Cir.1990) ("Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business."), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

The Eleventh Circuit has not expressly determined the proper standard for reviewing the plan administrator's *factual* determinations where the plan affords the plan administrator discretion and the administrator has a conflict of interest. However, the Eleventh Circuit has held that a heightened arbitrary-and-capricious standard of review applies to the plan administrator's *interpretation* of the plan where the plan affords the administrator discretion and the administrator has a conflict of interest. *See id.* at 1566–67. "[A] fiduciary operating under a conflict of interest may be entitled to review by the arbitrary and capricious standard for its discretionary decisions as provided in the ERISA plan documents, but the degree of deference actually exercised in application of the standard will be significantly diminished." *Id.* at 1568. The *Brown* court reasoned that, "when an insurance company serves as ERISA fiduciary to a plan composed solely of a policy or contract issued by that company, it is exercising discretion over a situation for which it

incurs 'direct, immediate expense as a result of benefit determinations favorable to [p]lan participants.'" *Id.* at 1561 (quoting *de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1191 (4th Cir.1989)).

The Eleventh Circuit applies a burden-shifting analysis under the heightened arbitrary-and-capricious standard applicable to the plan administrator's *interpretation* of a plan. *See Brown,* 898 F.2d at 1566–67; *Sahlie v. Nolen,* 984 F.Supp. 1389, 1400 (M.D.Ala.1997) (Thompson, C.J.). Under this approach, the court first must determine whether the interpretation of the plan proffered by the claimant is reasonable. *See Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.,* 41 F.3d 1476, 1481 (11th Cir.1995), *cert. denied,* 514 U.S. 1128, 115 S.Ct. 2002, 131 L.Ed.2d 1003 (1995); *Sahlie,* 984 F.Supp. at 1400–01. If it determines that the claimant's interpretation is reasonable, the court applies the principle of *contra proferentem,*[84] construing ambiguities in the facts against the plan administrator, to find that the administrator's interpretation of the plan is wrong. *See Florence Nightingale,* 41 F.3d at 1481; *Sahlie,* 984 F.Supp. at 1401. Next, the court determines whether the plan administrator was arbitrary and capricious in adopting its incorrect interpretation. *See Sahlie* 984 F.Supp. at 1401. In so doing, the court places the burden upon the administrator to establish that its action was not tainted by self-interest. *See Florence Nightingale,* 41 F.3d at 1481; *Sahlie,* 984 F.Supp. at 1401. Even a reasonable interpretation will be found arbitrary and capricious unless the administrator can demon-

---

**82.** *See id.* at 588. "The Plan Administrator has discretionary authority to determine eligibility for benefits and to construe the terms of the Plan." *Id.*

**83.** *See* Plaintiff's brief, filed February 19, 1999, at 3; Defendant's brief, filed March 5, 1999, at 13.

**84.** *"Contra proferentem"* is a term "[u]sed in connection with the construction of written documents to the effect that an ambiguous provision is construed most strongly against the person who selected the language." *Black's Law Dictionary* 327 (6th ed.1990) (citing *United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 887–88, 25 L.Ed.2d 224 (1970)).

strate that its decision was not motivated by self-interest. *See Brown,* 898 F.2d at 1566–67; *Sahlie,* 984 F.Supp. at 1401. Finally, if the administrator does manage to carry this burden, the claimant may still succeed if the administrator's action was arbitrary and capricious by other measures. *See Brown,* 898 F.2d at 1568; *Sahlie,* 984 F.Supp. at 1401.

Because a conflict of interest could have an equally pernicious effect on a plan administrator's factual determination as on the interpretation of a contract term, this court finds that the heightened arbitrary-and-capricious standard applies to the review of factual determinations of a plan administrator who operates under a conflict of interest.[85] *See Ladd v. ITT Corp.,* 148 F.3d 753, 754 (7th Cir.1998) (stating that if the plan administrator has a conflict of interest, the arbitrary-and-capricious standard applies to the administrator's factual determinations, but "the judicial inquiry is more searching" than it would be if no conflict existed); *Sahlie,* 984 F.Supp. at 1401 (stating in *dicta* that, should it become evident that the plan administrator acted under a conflict of interest, the administrator's factual determinations would be reviewed under the same heightened arbitrary-and-capricious standard applicable to the administrator's plan interpretation). As discussed above, the Eleventh Circuit has determined that use of a burden-shifting analysis is appropriate in cases applying the heightened arbitrary-and-capricious standard of review. However, the burden-shifting analysis developed by the Eleventh Circuit for use in plan-interpretation cases must be modified in part to render it applicable to cases involving challenges to factual determinations. Two aspects of the analysis require

modification. First, the first part of the burden-shifting analysis in a plan-interpretation case is determining whether the claimant's interpretation of the plan is reasonable; in analyzing factual determinations, the court will instead examine whether the claimant has shown that her version of the facts is supported by the record. Second, because the principle of *contra proferentem* is a guide to contract interpretation holding that contract terms must be construed against the drafter, it clearly does not apply to review of factual determinations.[86] Therefore, the court will amend the second part of the burden-shifting analysis as follows: if the claimant shows that her factual allegations are supported in the record, the court will draw all inferences from the facts against the plan administrator, to find that the administrator's factual determinations are wrong. The rest of the analysis requires no modification: the court will determine whether the plan administrator was arbitrary and capricious in making its factual determinations, placing the burden upon the administrator to establish that its action was not tainted by self-interest; and, if the administrator carries its burden, the court will allow the claimant to show by other measures that the factual determination was arbitrary and capricious.

## III.  DISCUSSION

■ Lake contends that the evidence before UNUM on April 17, 1997, the date of UNUM's decision to terminate Lake's mental-illness-disability-benefit payments, and on March 18, 1998, the date of UNUM's denial of her appeal, shows that Lake was disabled as a result of chronic back pain.[87] The first question is, there-

---

85.  The court notes that the Eleventh Circuit has stated that there is no substantive distinction between the arbitrary-and-capricious standard and the abuse of discretion standard in the context of reviewing a plan administrator's decisions. *See Paramore,* 129 F.3d at 1450 n. 2; *Brown,* 898 F.2d at 1558 n. 1.

86.  *See supra* note 84.

87.  *See* Plaintiff's brief, filed February 19, 1999, at 23. Lake does not argue that the evidence before UNUM in May 1995, the date of its initial decision to discontinue her dis-

fore, whether Lake's contention is supported by the record.

The ERISA plan defines 'disability' and 'disabled' to mean that because of injury or sickness:

"1.  the insured cannot perform each of the material duties of his regular occupation; or

"2.  the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:

a.  performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

b.  earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness."[88]

Under the plan, benefits are generally paid until the claimant reaches age 65, if she remains disabled.[89] However, benefit payments for disability due to mental illness, meaning any type of mental, nervous, or emotional disease or disorder, will not, with limited exceptions, exceed 24 months.[90]

Between the dates of its initial decision to terminate Lake's disability benefits, in May 1995, and its decision to terminate her mental-illness-disability benefits, in April 1997, UNUM received a plethora of information from doctors concerning Lake's physical and mental condition. Specifically, UNUM received the additional statement completed by Drs. Zubowicz

and Ryan, Dr. Prichard's report, and Dr. Walsh's treatment notes. The additional statement, which UNUM received on May 24, 1995, indicates that Lake was disabled, but that her disability was primarily psychological and only secondarily physical. Dr. Prichard's report, which UNUM received around December 19, 1995, also indicates that Lake was disabled. Dr. Prichard's report, however, indicates that Lake's disability is largely the result of her chronic back condition: Lake's diagnosis is "Pain disorder associated both with psychological factors and a general medical condition, chronic...."[91] Moreover, Lake's physical pain "limits her ability to travel and to sit for extended periods of time without frequent breaks."[92] Dr. Prichard also reported that Lake's "depressive state appears to have been precipitated by her spinal surgery and associated pain."[93] Finally, Dr. Walsh's treatment notes indicate that Lake's pain level fluctuated. However, his most recent note before UNUM's decision to terminate Lake's benefits states that Lake continues to have pain associated with her back condition.

The court finds that, read together, Drs. Zubowicz and Ryan's additional statement, Dr. Prichard's report, and Dr. Walsh's notes reasonably support Lake's contention that she was disabled in April 1997 as a result of chronic back pain. Most significant to the court's finding is Dr. Prichard's report, which states that Lake's disability is largely the result of a chronic back condition and that the condition limits her ability to sit and to travel. As executive vice-president of Synovus Securities, Lake is sedentary and must travel extensively.[94]

ability benefits, shows that she was disabled due to chronic back pain.

**88.**  Joint Evidentiary Record, filed February 5, 1999, at 11.

**89.**  *See id.* at 21.

**90.**  *See id.* at 4.

**91.**  *Id.* at 313.

**92.**  *Id.* at 312.

**93.**  *Id.* at 313.

**94.**  *See id.* at 124.

The information made available to UNUM after its April 1997 decision and before its denial of Lake's appeal in March 1998 further supports Lake's contention. During this period, UNUM received Dr. McClanahan's report and Dr. Walsh's answers to UNUM's questions. In his report, Dr. McClanahan concluded that Lake's pain assessment was in the severe range, which is occupationally debilitating. More importantly, in his answers to UNUM's questions, Dr. Walsh stated that Lake's diagnosis is chronic discogenic low back pain and sciatic syndrome, that she is totally disabled from any gainful employment, and that she probably never would be released to work. Consequently, Lake has met her burden of establishing that the evidence before UNUM on the dates of its relevant decisions supports her contention that she was disabled as the result of chronic back pain. Drawing all factual inferences against UNUM, the court, therefore, finds UNUM's determination to the contrary is wrong.

■ The court must next determine whether UNUM was arbitrary and capricious in making its factual determinations. As discussed earlier, the burden is on UNUM to establish that, even if reasonable, its decision was not motivated by self-interest. To make this determination, the court will evaluate the reasons stated by UNUM in its letter to Lake, dated March 18, 1998, in which it denied her appeal of its April 1997 decision to terminate her disability benefit payments.

UNUM's decision was primarily based on three factors. First, the last treatment note UNUM received from Dr. Walsh, dated August 22, 1996, states that Lake was then pain-free and feeling 100 percent better.[95] This note, according to UNUM, does not indicate that "Lake's psychiatric condition ... was perpetually caused by chronic back pain or any other kind of physical pain."[96] Second, UNUM reasoned that even if Lake's reported difficulty with prolonged sitting was substantiated with evidence, it would not preclude her from returning to work.[97] Third, UNUM found that Lake's medical reports did not substantiate that her mental impairment "was caused exclusively or primarily by her chronic, intense back pain."[98] "On the contrary," according to UNUM, "it appears that Ms. Lake's back condition was resolved to the point that she could have returned to work in her occupation as early as August 22, 1996."[99]

In reaching its decision, UNUM did not consider Dr. Walsh's February 19, 1997, telephone note, Dr. McClanahan's vocational report, Dr. Walsh's answers to the questions UNUM had submitted to him, or Dr. Prichard's report. UNUM found Dr. Walsh's February 19, 1997, telephone note and Dr. McClanahan's vocational report to be irrelevant. Dr. Walsh's note, UNUM states, "does not suffice as medical evidence that Ms. Lake's back condition was of such severity that she could not perform her occupation; nor does it suffice as evidence that any mental impairment she suffered through April 1997 was caused by chronic, intense back pain beyond August 22, 1996."[100] UNUM found Dr. McClanahan's report irrelevant because his testing of Lake occurred "nearly five months after [the] decision to terminate Ms. Lake's benefits"[101] and because the report was based on Lake's functional ability, rather than on

95.  *See id.* at 574.

96.  *Id.*

97.  *See id.*

98.  *Id.* at 573.

99.  *Id.*

100.  *Id.* at 574.

101.  *Id.* at 573.

medical documentation.[102] Finally, UNUM claimed that it had not received Dr. Walsh's answers to the questions that it had posed to him on December 2, 1997, or any treatment notes from him after the February 1997 telephone note.[103] UNUM's denial letter did not mention Dr. Prichard's report.

Based on the evidence that UNUM considered and the reasons it gave for not considering Dr. Walsh's telephone note and Dr. McClanahan's report, UNUM's decision to deny Lake's appeal may have been reasonable. However, by not considering Dr. Prichard's report and Dr. Walsh's answers, UNUM appears to have been motivated by self-interest. UNUM's failure even to mention Dr. Prichard's report in its letter to Lake makes UNUM's decision particularly suspect. In its brief, UNUM attempts to discount Dr. Prichard's report by arguing that, first, the report was based on Dr. Prichard's examination of Lake nearly six months after its initial decision to terminate her benefits; second, Dr. Prichard is not a medical doctor; and, third, the report was based on Lake's treatment notes provided to Dr. Prichard by other physicians.[104] In other words, UNUM has attacked the credibility of Dr. Prichard's report. Such an attack is unjustifiable in light of the fact that UNUM elected to have Lake undergo an examination specifically by Dr. Prichard. Moreover, UNUM asked Dr. Prichard to answer specific questions about Lake in order to "clarify [her] current medical status."[105] Dr. Prichard's report specifically answers those questions. Because the substance of Dr. Prichard's report supports a finding that Lake's disability was caused by her chronic back pain, UNUM has a pecuniary interest in undermining its credibility. UNUM cannot decide not to consider Dr. Prichard's report simply because it does not like what the report reveals.

Equally suspect is UNUM's reason for not considering Dr. Walsh's answers. Dr. Walsh's letter to UNUM stating his answers to its questions is dated February 18, 1998, exactly one month before the date of UNUM's letter to Lake's attorney denying Lake's appeal. Dr. Walsh's answers were addressed to Barrett Scoggins, in UNUM's Atlanta, Georgia office,[106] the same person who posed the questions to him.[107] UNUM, however, contends that it did not receive Dr. Walsh's answers until after this litigation began.[108] Because Dr. Walsh's answers explicitly state that Lake's disability is the result of her chronic back pain which permanently and totally precludes her from any gainful employment, UNUM has a financial incentive not to consider them. Under these circumstances, the court finds UNUM's 'lost in the mail' excuse untenable.[109]

As an alternative argument, UNUM, as it did with Dr. Prichard's report, attacks

---

102.  *See id.*

103.  *See id.* at 574.

104.  *See* Defendant's brief, filed March 5, 1999, at 17 n. 2.

105.  Joint Evidentiary Record, filed February 5, 1999, at 275.

106.  *See id.* at 650.

107.  *See id.* at 499–500.

108.  *See* Defendant's brief, filed March 5, 1999, at 19 n. 4.

109.  In arguing that Dr. Walsh's answers were untimely, UNUM's reliance on *Buckley v. Met-* *ropolitan Life*, 115 F.3d 936 (11th Cir.1997), is misplaced. *See* Defendant's brief, filed March 5, 1999, at 21. In *Buckley*, the Eleventh Circuit held that the insurer's decision to terminate the claimant's benefits was not arbitrary and capricious when the claimant had failed to submit proof of her continued disability before the insurer had decided to terminate her benefits. *See Buckley*, 115 F.3d at 941. The case at bar is distinguishable from *Buckley* on several grounds. For instance, first, in *Buckley*, the parties agreed that the insurer had not received the required proof until after the insurer had made its decision to terminate. *See id.* Here, of course, that issue is in dispute and, as discussed, the court is unpersuaded by UNUM's argument that it

the credibility of Dr. Walsh answers and Dr. Walsh himself.[110] However, considering that UNUM requested the answers from Dr. Walsh, that Dr. Walsh examined Lake before submitting his answers to UNUM, that his answers are consistent with many of his earlier notes regarding his treatment of Lake, and that UNUM has provided no persuasive reason why the court should question Dr. Walsh's veracity, UNUM's assault on Dr. Walsh and his report is without merit.

In sum the court finds that, because UNUM did not consider either Dr. Prichard's report or Dr. Walsh's answers, its decision to terminate Lake's long-term disability benefits was arbitrary and capricious. UNUM has not satisfied its burden of establishing that, even if reasonable, its decision to terminate Lake's benefits was not motivated by self-interest. In fact, UNUM has put forth no evidence or argument to mitigate the plain inference that its decision to not consider Dr. Prichard's report and Dr. Walsh's answers was motivated by its own pecuniary interest.

## IV. CONCLUSION

Based on the foregoing, the court will enter judgment in favor of Lake. An appropriate judgment will be issued.

### *JUDGMENT*

In accordance with the memorandum opinion entered on this date, it is the ORDER, JUDGMENT, and DECREE of this court that judgment be and it is hereby entered in favor of plaintiff Frankie E. Lake and against defendant UNUM Life Insurance Company of America.

It is further ORDERED that this matter is remanded to defendant UNUM Life Insurance Company of America for a calculation and payment of retroactive benefits to plaintiff Lake.

It is further ORDERED that costs are taxed against defendant UNUM Life Insurance Company of America which execution may issue.

did not timely receive Dr. Walsh's answers. Second, in *Buckley,* the claimant had not submitted any written communication to the insurer for seven months prior to its decision to terminate, a factor which was significant to the court's decision. *See id.* In contrast, Dr. Walsh notified UNUM on January 26, 1998, seven weeks before UNUM issued its denial letter to Lake, that his answers would be forthcoming after he evaluated Lake's data on

February 3, 1998. Third, in *Buckley,* the insurer had not specifically requested information from the claimant or one of her doctors. UNUM had, and, therefore, had a duty to consider that information.

**110.** *See* Defendant's brief, filed March 5, 1999, at 22–24.