**Willie GRAYER, Plaintiff,**

v.

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,**
**Defendant**

**No. 8:02–CV–2410–T–17MSS.**

United States District Court,
M.D. Florida,
Tampa Division.

July 20, 2004.

Michael Alan Steinberg, Michael A. Steinberg & Associates, Tampa, FL, for Plaintiff.

Lee W. Marcus, Marcus, McMahon & Myers, PL, Orlando, FL, for Defendant.

### *ORDER*

KOVACHEVICH, District Judge.

This action is before the Court on the Defendant's Motion for Summary Judgment, and incorporated memorandum of law (Dockets No. 18–19 & 21) and response thereto (Docket No. 28). This Court, having reviewed Defendant's motion and memorandum, and Plaintiff's response (Docket No. 28) does hereby find as follows:

## BACKGROUND AND FACTS

Willie Grayer ("Plaintiff") was employed by CSR, which offered disability insurance through Liberty Life Assurance Company of Boston ("Defendant"). Plaintiff brought this action seeking to recover long term disability benefits under an employee welfare benefit plan ("the Plan") established and sponsored by CSR for its participating employees and their dependants. The Plan is governed by provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1461 ("ERISA"). This action arises under ERISA, in particular, 29 U.S.C. § 1132, and this Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

### The Plan

The Plan provides long term disability benefits for CSR employees, as per the express terms and conditions of the Plan. Defendant, as claims administrator of the Plan, has discretionary authority to construe the terms of the Plan and to make determinations as to benefits eligibility. The Group Disability Income Policy provides:

> [Defendant] shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine eligibility hereunder. [Defendant's] decisions regarding construction of the terms of the policy and benefit eligibility shall be conclusive and binding.

Pursuant to the Plan, a participant is "disabled" during the elimination period and the first 36 months of benefits if he is "unable to perform the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness." After 36 weeks of benefits, the participant is considered "disabled" if he is "unable to perform, with reasonable continuity, the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity."

The Plan states that disability benefits are payable in the following manner:

> When [Defendant] receives proof that a Covered Person is Disabled due to Injury or Sickness and requires regular attendance of a Physician, Liberty will pay the Covered Person a Monthly benefit after the end of the Elimination Period. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty proof of continued:
>
> 1. Disability; and
> 2. regular attendance of a Physician.

The Plan also provides that "[p]roof of continued Disability or Partial Disability, when applicable, and regular attendance of a Physician must be given to [Defendant] within 30 days of the request for proof."

### Plaintiff's Medical History

Prior to March 6, 2000, Plaintiff was employed by CSR and participated in the Plan. Plaintiff, who last worked on March 3, 2000, drove a cement mix truck for CSR.

Defendant received notice of Plaintiff's long term disability claim by telephone. At that time, it was stated that the disabling condition was "chest pain." On March 31, 2000, Defendant received an Attending Physician's Statement ("APS") from Plaintiff's primary care physician, Dr. Jeram Kankotia, in which Dr. Kankotia diagnosed "COPD [chronic obstructive pulmonary disease], back pain, atypical chest pain, chronic obstructing lung disease, [and] mild ischemic condition." Dr. Kankotia indicated that Plaintiff had a "class 3" physical impairment, denoting a "slight limitation of functional capacity; capable of light work." Dr. Kankotia did not consider Plaintiff to have any mental/nervous impairment or cardiac impairment.

Plaintiff was granted benefits under CSR's Short Term Disability ("STD")

Plan, and the 90–day elimination period under the Long Term Disability ("LTD") Plan commenced. On April 19, 2000, Defendant spoke with Plaintiff and discovered that on March 22, 2000, while still on STD, Plaintiff was in an automobile accident. As a result of that accident, Plaintiff experienced headaches, neck pain, increased back pain, pain radiating down his right side, and pain in his right hip.

For nearly two months, Defendant had difficulty obtaining medical records in support of Plaintiff's claim. Plaintiff did not provide medical support for his claim and his physicians refused to provide Plaintiff's records without payment. Although it is normally the obligation of a claimant to bear the expense of obtaining medical records, Defendant recognized that Plaintiff was having difficulty paying for the necessary records, and Defendant paid Plaintiff's physicians for the medical records.

Subsequently, Defendant received medical records from Dr. Bernard Khaw which reflected complaints of back pain, neck pain, tingling in the right fingers, headache, right hip pain, and atypical chest pain. Plaintiff underwent physical therapy and had a diagnostic test done. A CT scan of the cervical spine conducted on April 27, 2000, showed "diffuse spondylosis with multilevel disk margin bulging with no compressive disc herniation evident" and "diffuse advanced facet osteoarthropathy with multilevel bilateral neural foraminal stenosis most marked on the left at C4–5 and on the right at C5–6 and on the left at C6–7." Chest x-rays taken on the same date revealed left ventricular enlargement, no infiltrate of lung failure, and signs suggesting COPD. A physician at Florimed Health Group certified disability on May 19, 2000, writing as follows:

Pt. is to remain out of work until next visit. Pt. can't bend, stoop, or step up. He is not to lift over 10 lbs. He can't rotate his head to either side.

Based on this information, Defendant continued to pay Plaintiff's STD benefits through the remainder of the maximum benefits period under the STD Plan.

Plaintiff exhausted his STD benefits as of June 4, 2000, and became eligible to receive LTD benefits. On June 22, 2000, Dr. Joanne Link provided CSR, and in turn Defendant, a Medical Authorization for Return to Work form, dated June 19, 2000. On that form, Dr. Link stated that as of June 19, 2000, Plaintiff was able to work with the following restrictions: no excessive repetitive lifting/carrying, pushing, pulling, repetitive bending, lifting over 25 pounds, or squatting. These restrictions were to remain in effect until Plaintiff's follow-up visit with Dr. Link in two weeks.

On June 22, 2000, Defendant determined that Plaintiff was entitled to receive LTD benefits under the Plan. Although Plaintiff had returned to work on a part-time basis, with accommodation from CSR, Defendant recognized that such limited return to work did not satisfy the requirement of "Active Employment" in his own occupation, which requires full-time employment. On June 26, 2000, Defendant wrote to Plaintiff, informing him that his claim for LTD benefits had been approved. On that same date, CSR informed Defendant that Plaintiff had been unable to sustain the part-time work, and that he had gone back out of work completely.

On June 28, Defendant received a Notice of Disability signed by Dr. Link in which she stated that "[Plaintiff] is unable to bend, stoop, step up, or rotate head to either side." Defendant continued to pay Plaintiff's LTD benefits without further inquiry until October 19, 2000. On that date, Defendant requested follow-up information from Dr. Link. In response, Defendant received a letter from a company called "@merican enterprise.com" [sic]

dated October 19, 2000, advising Defendant that Dr. Link's group, Florimed Health Group, closed its facility in August 2000, and therefore there were no physicians or staff to provide follow-up information after that date. Defendant then requested that @merican enterprise.com provide all of Florimed Health Group's records for Plaintiff, and Florimed's records, 134 pages, were sent on October 20, 2000. Among those records, were duplications of information Defendant had previously obtained. However, there were also records from late June and July 2000 that Defendant had not seen. These June/July records resulted in Dr. Link requesting that Plaintiff see an orthopaedist for severe bilateral hip osteoarthropathy with secondary neuropathy. This consult scrip of July 18, 2000, was the final entry in Florimed's records for Plaintiff.

On October 26, 2000, Defendant advised Plaintiff that it was unable to obtain any medical documentation in support of his claim after July 2000, Defendant stated that it could not continue to authorize benefits beyond November 30, 2000 until such time it received medical information from a current treating physician. Plaintiff was given until November 30, 2000 to provide supplemental proof in support of continuing disability.

On November 6, 2000, Defendant received a Claimant Information Form from Plaintiff, identifying Dr. Kankotia and Dr. Michael Buscemi as his current treating physicians. On November 7, 2000, Defendant requested supplemental information from Drs. Kankotia and Buscemi, and provided them with APS forms to complete. In response, Defendant received records from Dr. Buscemi tracking Plaintiff's medical chronology as follows:

On August 21, 2000, Plaintiff first saw Dr. Buscemi, an orthopaedic surgeon, as a referral from Dr. Kankotia for evaluation of his right hip. Dr. Buscemi diagnosed severe osteoarthritis of the right hip with arthrofibrosis and subchondral sclerosis and cystic formation of the right hip. Dr. Buscemi further noted a history of degenerative disc disease with herniated disc diagnosed by CT scan. On that date, Dr. Buscemi planned to have a current MRI of the lumbar spine taken to evaluate the suspicion of herniated disc. If herniation were confirmed, it would be addressed first, but if no herniation were found, Dr. Buscemi planned to perform a total hip replacement.

Dr. Buscemi's records did not reflect the results of the lumbar MRI, but a total hip replacement was scheduled for September 15, 2000. On September 8, 2000, chest x-rays were negative for significant radiographic abnormality. On September 14, 2000, Plaintiff was given a pre-operative cardiac screening. The cardiologist, Dr. Thomas Woodrow, determined that despite the absence of EKG changes indicative of ischemia or infarction, the Plaintiff's risk factors and history of complaints of chest pain warranted dual isotope radionucleide imaging with Persantine stimulation prior to undergoing general anesthesia for hip surgery. This additional testing, which was conducted on September 21, 2000, showed no significant perfusion abnormalities to suggest prior infarction or significant regions of provokable ischemia. These results suggested a low probability for cardiac complications that would contraindicate the hip surgery.

On October 10, 2000, Plaintiff underwent a total hip replacement. On October 26, 2000, Plaintiff followed up with Dr. Buscemi, and was "progressing very well." X-rays confirmed anatomical alignment and position of the prosthesis. Dr. Buscemi proscribed physical therapy and recommended a consultation for Plaintiff's lower back pain. Further follow-up on November 16, 2000, showed continued progress

with the hip, although Dr. Buscemi noted continued back pain.

Based on the information received from Dr. Buscemi, Defendant continued paying Plaintiff's LTD benefits. Four months later, in March 2001, Defendant requested an update of Plaintiff's medical status. Dr. Buscemi responded with records showing that Plaintiff had experienced complications due to failure of the hip prosthesis. Specifically, on February 13, 2001, Plaintiff presented to Dr. Buscemi with pain that was consistent with symptoms that had been reported as the result of a manufacturing defect in the specific type of prosthesis used in Plaintiff's hip replacement surgery. X-rays of the hip revealed some lucency of the cup, but evidence of loosening was not seen. On March 14, 2001, repeat x-rays showed inconclusive loosening of the prosthesis. On that date, a revision of the right hip replacement was performed.

On June 21, 2001, Plaintiff was awarded Social Security Disability Income ("SSDI") benefits by the Social Security Administration ("SSA"). The SSA determined that Plaintiff was not disabled on March 22, 2000, as claimed, but that information received from Dr. Buscemi showed that Plaintiff's condition was disabling on March 14, 2001. Thus, SSA established March 1, 2001 as Plaintiff's disability date for the purpose of SSDI benefits. In essence, SSA determined that the motor vehicle accident of March 2000 did not cause a disability, but that the hip replacement revision of March 2001 did.

In July 2001, Dr. Buscemi completed a Restrictions Form discussing his assessment of Plaintiff's condition and course of progress. The Restrictions Form provided that Plaintiff had last been treated on June 7, 2001, and the next scheduled appointment was to occur in three months. Dr. Buscemi indicated an estimated Return To Work ("RTW") date of October 1, 2001, following Plaintiff's March 2001 revision surgery, noting that the return to work would be "light duty only." Dr. Buscemi wrote that Plaintiff's restrictions and limitations were as follows:

No prolonged sitting, standing, walking. No lifting. Pt. also has chronic lower back pain.

Although Dr. Buscemi wrote that Plaintiff had "plateaued in [treatment]" without normal function, the doctor also described a continuing treatment plan of "physical therapy, work hardening & pain management."

Defendant continued paying Plaintiff's benefits without inquiry into his medical condition for another year. On June 11, 2002, Defendant requested an update from Dr. Buscemi. Dr. Buscemi responded that Plaintiff "hasn't been here since June '01'." Thus, the June 7, 2001 office visit was the last time Plaintiff treated with Dr. Buscemi.

Defendant then tried to reach Plaintiff to find out whether he was treating with a physician other than Dr. Buscemi, but Plaintiff was not available by telephone. On June 12, 2002, Defendant sent a letter to Plaintiff terminating benefits. In the letter, Defendant cited to the Plan language requiring that a claimant be under "regular attendance of a Physician" and provide proof of continued disability in order to remain eligible for benefits under the Plan. The termination letter further stated that Defendant did not have any records supporting disability after June 2001 or showing that Plaintiff followed through with Dr. Buscemi's treatment plan of physical therapy, work hardening, and pain management. Defendant's letter explained Plaintiff's right to appeal the adverse benefits determination, and requested that Plaintiff submit "documentation such as any and all medical documentation from treating physicians from *June 2001*

*through the present time, as well as any other medical documentation which you feel will support your claim."* [emphasis original].

In response to the June 12, 2001, letter, Defendant received a letter from Michael Steinberg, Esq. on June 28, 2002, dated June 24, 2002. In that letter, Mr. Steinberg stated that he had been retained by Plaintiff, that Plaintiff wished to appeal the termination of benefits, and that Mr. Steinberg would like "a copy of all non privileged portions of [Plaintiff's] claim file so that I can review the same, obtain updated medical evidence, and submit additional information."

On July 2, 2002, Defendant complied with Mr. Steinberg's request for a copy of the claim file. Along with the file, Defendant sent a letter requesting that Mr. Steinberg submit additional documentation in support of Plaintiff's appeal.

On July 9, 2002, Mr. Steinberg wrote a letter to Defendant stating that Plaintiff had "recently" had appointments with Dr. Shaukat Chowdhari and Dr. Kankotia, and that Mr. Steinberg would forward records from these physicians when he received them. On July 17, 2002, Mr. Steinberg wrote a letter to Defendant stating that he was enclosing "copies of medical records I received from Dr. Jerambhai Kankotia regarding [Plaintiff]." Attached to that letter was one page of medical documentation from Dr. Kankotia referencing an office visit on March 6, 2002. The March 6, 2002, office note stated that on that date Plaintiff complained of continued lower back pain, Plaintiff had no appetite for two weeks and Plaintiff had a cough. There was a check mark next to pre-printed symptoms, denoting that Plaintiff had "cough/colored phlegm" and "recent or chronic backache." There was no check mark indicating reported symptoms of "tingling/numbness," "muscle/bone/joint pain," or "difficulty with walking/chores."

Dr. Kankotia specifically noted that Plaintiff ambulated independently, without use of assistive devices. The office note did not indicate any restrictions or limitations for Plaintiff, nor did it contain any reference to a course of treatment other than a recommended follow-up in three months. Defendant never received any documentation suggesting Plaintiff did a follow up.

Defendant waited for further documentation until October 15, 2002, before making a determination on the full and fair review, but no documentation from Plaintiff was forthcoming. On October 15, 2002, Defendant wrote a letter to Mr. Steinberg stating that it still did not have sufficient medical documentation to warrant reinstatement of benefits, and again requested that Mr. Steinberg submit "all medical documentation from all of [Plaintiff's] treating doctors from July 25, 2001 to present by November 14, 2002."

On November 15, 2002, having received nothing further from Plaintiff or Mr.Steinberg, Defendant referred the claim to a vocational consultant for review of Plaintiff's occupation. The vocational consultant, David Carey, contacted CSR to discuss the specific requirements of Plaintiff's occupation. Having confirmed that Plaintiff drove and operated a cement mixer truck, Mr. Carey reviewed the Dictionary of Occupational Titles ("DOT") for "Concrete Mixing Truck Driver" and for "Heavy Truck Driver." Mr. Carey then conducted research into the occupation of "Truck Driver" and determined that while Plaintiff's job was to drive a cement mixer truck, his general "occupation" as performed within the national economy is that of "Truck Driver, Heavy." This occupation ranges from light to heavy duty depending on the specific truck driven, cargo carried, whether the driver must load/unload cargo and other factors. Mr. Carey indicated that he had recently worked on a

case similar to that of Plaintiff's in which the claimant could not tolerate the physical demands of driving the concrete mixing truck he had driven before his disability claim, but it was determined that he was not disabled from his own occupation because he could not satisfy the requirements of his general occupation as a "Truck Driver, Heavy" as that occupation is performed with many employers in the national economy.

On December 5, 2002, Defendant wrote to Mr. Steinberg upholding the termination of Plaintiff's benefits. In that letter, Defendant explained that despite Plaintiff's continued complaints of lower back pain, there was insufficient medical information provided to support a condition of such severity that Plaintiff was disabled from performing his own occupation. Defendant went on to outline the history of Plaintiff's claim and to reiterate that Plaintiff had failed to adequately document proof of disability as required by the terms of the Plan.

In January 2003, Plaintiff brought this action against defendant, seeking benefits under the Plan.

## DISCUSSION

### Standard of Review for Summary Judgment

This Circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the non-moving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–97 (5th Cir.1989) (quoting *Gross v. Southern Railroad Co.*, 414 F.2d

292 (5th Cir.1969)). Factual disputes preclude summary judgment.

The United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), held as follows:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 317, 106 S.Ct. 2548.

The Court also stated that, "Rule 52(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Id.* at 328, 106 S.Ct. 2548.

■ The subject policy provides that, "[Defendant] shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine eligibility hereunder. [Defendant's] decisions regarding construction of the terms of the policy and benefit eligibility shall be conclusive and binding." Due to the fact that Defendant is afforded the discretion to determine eligibility for benefits, as well as to interpret the terms and provisions of the policy, and that Defendant pays the claims from its own assets, this Court concludes that the heightened arbitrary and capricious standard of review is appropriate. *See, e.g., Brown v. Blue Cross and Blue Shield of Ala.*, 898 F.2d 1556 (11th Cir.1990).

Under *Brown*, when the plan fiduciary making the benefit decision is also the insurance company responsible for paying claims, the arbitrary and capricious stan-

dard of review "must be contextually tailored." *Id.* at 1564. The Court's review is limited to reviewing only the facts known to Defendant when the claim decision was rendered, and this Court is not required to consider the fiduciary's self-interest unless the Court concludes the benefit determination was wrong.

The arbitrary and capricious standard applies to factual determinations by the plan administrator. *Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446 (11th Cir. 1997). Some courts have modified the analysis when there is a conflict of interest, shifting the burden. *See, e.g., Lake v. UNUM Life Insurance Company of America,* 50 F.Supp.2d 1243 (M.D.Ala. 1999). Other courts have not found the modification to be practical. See, e.g., *Thomas v. Lockheed Martin Information Systems et al.,* 155 F.Supp.2d 1316, 1324 (N.D.Fla.1991). In *Thomas,* the court found the "sliding scale" approach in *Pinto v. Reliance Standard Life Insurance Co.,* 214 F.3d 377 (3d Cir.2000) to be useful, and the Court will use that approach.

### The Defendant's Motion for Summary Judgment

Under the standards set forth in *Brown v. Blue Cross and Blue Shield of Ala.,* 898 F.2d 1556 (11th Cir.1990), the Court must first evaluate the administrator's interpretation of the plan to determine if it is "wrong." "Wrong" is the label used by our precedent to describe the conclusion a court reaches, when after reviewing the plan documents and disputed terms de novo, the court disagrees with the claim administrator's plan interpretation. *HCA Health Services of Georgia, Inc. v. Employers Health Insurance Co.,* 240 F.3d 982 (11th Cir.2001). Only when the court disagrees with the decision does it look for a conflict, and when it finds such a conflict, it reconsiders the decision in light of the conflict. *Id.* Furthermore, circuit courts have recently written that "it is a fundamental principle of contract law that disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment." *Tamarind Resort Assoc. v. Government of the Virgin Islands,* 138 F.3d 107 (3d Cir. 1998); *see also Anderson v. AT&T Corp.,* 147 F.3d 467, 476 (6th Cir.1998).

The Disability Income Benefits section of the Plan states, in regard to long-term disability coverage, that: "[w]hen [Defendant] receives proof that the Covered Person is disabled due to injury or Sickness and requires the regular attendance of a Physician, [Defendant] will pay the Covered Person a Monthly Benefit after the end of the Elimination Period. The benefit will be paid for the period of Disability if the Covered Person gives to [Defendant] proof of continued disability and regular attendance of a physician." . The Plan also requires that "[t]he proof must be given upon [Defendant's] request and at the Covered Person's expense."

The parties do not dispute the fact that Plaintiff was disabled from March 2000 to June 2002. However, the dispute is whether Plaintiff is entitled to receive LTD benefits from the Plan from June 2002 until this action is adjudicated.

■ Applying the terms of the insurance contract as stated above, this Court finds that Defendant's decision to terminate benefits was not wrong. Plaintiff failed to provide any proof of disability for about a year prior to the termination of benefits. The administrative record shows that when Defendant terminated Plaintiff's LTD benefits in June 2002, the most recent medical documentation Defendant had received from Plaintiff, his attorney, or his physicians was dated June 2001. During the administrative review of Plaintiff's claim, the only medical documentation submitted by Plaintiff, his attorney or his physicians, which was dated after June

1, 2001, was the March 6, 2002 office note of Dr. Kankotia. Dr. Kankotia's note, which referenced Plaintiff's visit for "loss of appetite" and "cough," did not indicate any restrictions or limitations. From June 1, 2001 until the full and fair review on December 5, 2002, Plaintiff failed to submit proof of disability to Defendant. Even under the most lenient interpretation of the Plan, one doctor's note within a period of one year hardly qualifies as "proof of continued disability and regular attendance of a physician." Under these circumstances. Defendant's termination of Plaintiff's LTD benefits was correct and reasonable. Accordingly, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 18) be **GRANTED,** and the Clerk of Court enter judgment for the Defendant and close this case.